22 N.J. Super. 550 (1952)
92 A.2d 110
MARGATE PARK PROTECTIVE ASSOCIATION, A CORPORATION OF THE STATE OF NEW JERSEY, BRUCE RIDDLE, CHARLES D. SINKINSON, DANIEL ARNOLD, MELVIN FELDMAN, J. CARLISLE BROWN AND STANLEY M. GROSSMAN, PLAINTIFFS,
v.
JOSEPH ABATE AND CAROLYN ABATE, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided October 30, 1952.
*552 Mr. Allen B. Endicott, Jr., for the plaintiffs (Messrs. Endicott, Dowling & Endicott, attorneys).
Mr. John Rauffenbart for the defendants
HANEMAN, J.S.C.
Plaintiffs herein seek a prohibitory and mandatory injunction to force the defendants to desist from the further construction of a cinderblock and brick wall some four feet in height, and to remove so much of said wall as is in excess of 18 inches in height. They seek this relief alleging that the wall violates a restrictive covenant contained in a deed from Howard G. Harris and Ida M. Harris, his wife, to Margate Company, dated January 19, 1910 and recorded in the office of the Clerk of Atlantic County in Book of Deeds 423, page 36, and that said Margate Company *553 was a common predecessor in title of both the plaintiffs and the defendants, each of whom obtained titles to their respective properties through mesne intervening conveyances.
The defendants raise numerous defenses by way of their answer, but argue particularly the following, upon which they now solely rely: (1) the restrictive covenant does not create or establish a neighborhood scheme; (2) if it is found that the covenants did create a neighborhood scheme there was an abandonment or modification; (3) plaintiffs have not established a right to maintain this action; (4) the provision regarding fences is unenforceable; (5) laches.
The facts in connection herewith are as follows:
By deed dated January 19, 1910, Howard G. Harris and Ida M. Harris, his wife, transferred and conveyed to Margate Company a certain tract of land in the City of Margate, County of Atlantic and State of New Jersey, which said deed contained certain restrictive covenants, one of which reads as follows:
"No fence shall be erected or maintained within 30 feet of any Street except a hedge fence or a coping (or both) said coping to be not more than 18 inches in height above the grade of the lots, provided that on any lot having a frontage on Ventnor Parkway no fence shall be erected or maintained except a hedge fence which shall be trimmed so as to conform as closely as practicable to the elevation (with relation to the sidewalk grades and shape of the hedge which may stand within Ventnor Parkway in front) of such lot."
This tract consists of some 77 numbered blocks of land containing a total of 1494 lots, and extends from the Atlantic Ocean on the south to an arm of the bay known as Beach Thorofare on the north, and from Mansfield Avenue on the east to Vendome Avenue on the west. For the width of the two blocks north of the Atlantic Ocean, to Ventnor Parkway, it extends in an easterly-westerly direction for ten blocks.
Both the plaintiffs and the defendants trace their title to the Margate Company.
The plaintiffs, except for Bruce Riddle, are the owners of homes on Union Avenue between Atlantic Avenue and *554 Ventnor Parkway. Bruce Riddle is the owner of a home between Atlantic Avenue and the Atlantic Ocean.
The defendants are the owners of a parcel of land extending from Thurlow Avenue to Union Avenue on Atlantic Avenue, being Lots 10 and 20 in Block 13.
By request and consent of counsel for the respective parties, the court has personally viewed the entire locality.
The tract encompassed in the Harris-Margate Company conveyance is one of the most attractive residential communities in this locality. There are few lots upon which homes have not been constructed, particularly in the section between Ventnor Parkway and the Atlantic Ocean. Large and expensive homes have been constructed, all of which are tastefully landscaped. The houses are set back some distance from the streets and have well-kept lawns. There are few fences or walls along the street front, so that the view is a pleasing one of continuous turf. Ventnor Parkway is especially pleasing to the eye with its three-lane roadway separated by two islands of shrubs and trimmed grass. There are presently erected some 212 homes between Ventnor Parkway and the Atlantic Ocean.
Although some preliminary work was done on the foundation of the wall here complained of prior to July 1, 1951, on that date defendants commenced the actual construction of the wall as it now exists. Work continued on July 2 and 3 and was completed on July 5, 1951. It runs along the property line on Atlantic Avenue and Union Avenue to a height of four feet. There is no doubt that the wall as so constructed violates the terms of the alleged restrictive covenant.
The first question to be resolved is whether a neighborhood scheme had been adopted.
A neighborhood scheme may be created in a number of ways. In Scull v. Eilenberg, 94 N.J. Eq. 759 (E. & A. 1923), the court said, at page 771, as follows:
"The most complete way, of course, is by a reciprocal covenant, whereby the grantor covenants to insert, in apt language, like covenants *555 in all deeds of his remaining lots or lands for the common benefit of all of his grantees and their assigns. Another way is for him to offer his lots for sale, and to sell them, on the representation that all lots will be conveyed subject to like covenants for the common benefit, in which case purchasers with notice or knowledge will be bound by the covenant. But, in the absence of either of these methods (as was the case here), the courts will only spell out such a scheme from a plan of lots and sales therefrom where all the deeds from the common grantor for the lots making up any particular neighborhood group of common benefit therefrom, are made subject to the common covenant. If, under these circumstances, the covenant is omitted from a deed of one lot so located that a violation on that lot of the provisions of the covenant would deprive the other lots of the benefit to be derived by them from the common observance of the restriction, there is, in the absence of knowledge or notice of the scheme on the part of the grantee in the deed for such omitted lot, a failure to make out a neighborhood scheme, at least as to that lot and as to such other lots as would lose the benefit of the scheme if it were violated on the lot not subjected to the covenant."
In order to effectively create such a plan or scheme, to be legally effective it must have certain characteristics. In Klein v. Sisters, &c., Saint Elizabeth, 101 N.J. Eq. 761, 139 A. 174 (E. & A. 1927), the court said, at page 766:
"`A general scheme of restrictions to be effective and enforceable must have certain characteristics. It must be universal, that is, the restrictions must apply to all lots of like character brought within the scheme. Unless it be universal it cannot be reciprocal. If it be not reciprocal, then it must as a neighborhood scheme fall, for the theory which sustains a scheme or plan of this character is that the restrictions are a benefit to all. The consideration to each lot owner for the imposition of the restriction upon his lot is that the same restrictions are imposed upon the lots of others similarly situated. If the restrictions upon all lots similarly located are not alike, or some lots are not subject to the restrictions while others are, then a burden would be carried by some owners without a corresponding benefit. The burden follows the benefit, and where there is no benefit there should be no burden. * * *'"
See also Weinstein v. Swartz, 3 N.J. 80 (1949).
Although it is a general requirement that the restrictions must be uniform, this does not connote that the restrictions on every lot in the neighborhood need be identical. To be fatal, a lack of uniformity in the restrictions as *556 imposed must be such as to wholly or partially destroy the scheme so as to neutralize the benefits of the restrictions to the point of defeating the object and purpose of the covenant. The mere fact of variations in the covenants means nothing unless it would be inequitable by reason thereof to enforce the restrictions. Sanford v. Keer, 80 N.J. Eq. 240, 83 A. 225 (E. & A. 1912); Humphreys v. Ibach, 110 N.J. Eq. 647, 160 A. 531 (E. & A. 1932); McComb v. Hanly, 128 N.J. Eq. 316, 16 A.2d 74 (Ch. 1940); reversed on other grounds, 132 N.J. Eq. 182, 26 A.2d 891 (E. & A. 1942); Palmer v. Circle Amusement Co., 130 N.J. Eq. 356, 22 A.2d 241 (E. & A. 1941); Weinstein v. Swartz, supra.
Defendants argue that because of the following provisions in the restrictions 
"(h) any lot may be used for any other purpose; provided however, that the consent of the owners and mortgagees of all the following lots be secured in writing and recorded. (1) every lot in the same block (2) every lot fronting on the same street or streets and located in any block or blocks directly across said street or streets from said block (3) every corner lot at the intersection of said street or streets with cross streets partly or wholly bounding said block."
there was not created a neighborhood scheme, due to the possibility of future lack of uniformity of restrictions.
Such a provision does not, in and of itself, serve to destroy the character of a neighborhood scheme, where, but for such a provision, such a scheme is found to exist. That the successors to the original covenantors may, by failing to act, i.e., by acquiescing in violations of a restrictive covenant, exhibit an intent to modify a general plan, cannot be doubted. (See cases hereafter cited on abandonment and modification). It must follow that the covenantors may as well modify the original covenant by affirmative action, i.e., by a written agreement exhibiting such intent. The provision herein set forth serves two purposes. It provides a method for one seeking a modification of a particular section of a restrictive covenant, to obtain concrete proof and irrevocable approval thereof in advance, without subjecting himself to the hazard *557 of future litigation. It as well restricts the future modification to a particular portion of the entire tract, so that the balance of the tract may not be affected, as consent thereto would not indicate a clear intent of the owners of the property more remotely located to so modify the entire plan. The change here provided for is the use to which the property may be put. It cannot be anticipated that the covenantees on any one street would consent to a change in the covenant which would result in an abandonment or modification of the entire plan in the entire affected area. Suffice it to cross that bridge when the occasion arises upon a consideration of the specific facts then proven. Nor can it be concluded in advance that the scheme will be so altered as to neutralize the benefits of the covenant to the point of defeating the objects and purposes thereof. Weinstein v. Swartz, supra.
In La Fetra v. Beveridge, 124 N.J. Eq. 24 (E. & A. 1938), the court found that a neighborhood scheme existed in spite of a provision that "no livery or public stables shall ever be erected thereon without the written consent of two-thirds of the lot owners * * *."
Patently, it was the intention of Howard G. Harris and Ida M. Harris, his wife, in providing for the restrictions, to create a residential community, the esthetic appearance of which would be at all times maintained. The result, as evidenced by the very substantial and expensively constructed homes, has generally justified the hope of the grantors that there would be established a beautiful residential community.
The covenants are reciprocal and for the benefit of all within the described tract. The general scheme of the restrictions here involved is universal, in that it applies to all lots of like character within the tract. All lots similarly located are subject to the identical restrictions.
It is therefore here held that as a result of the conveyance above referred to by the Harrises to the Margate Company, a neighborhood scheme was created.
*558 Defendants also have asserted that there was an abandonment or modification if any neighborhood scheme were ever created.
In order to prove an abandonment or modification of a neighborhood scheme, the materiality of the violations alleged is to be determined by the circumstances of each case, and the question to be resolved is whether the violations are such as to indicate an abandonment of the original general plan and to make its enforcement inequitable because of the changed conditions of the property. Violations, in order to constitute an abandonment, must be so general as to indicate either a change in the neighborhood or a clear intent on the part of the property owners generally to abandon or modify the original plan. See Morrow v. Hasselman, 69 N.J. Eq. 612 (Ch. 1905); La Fetra v. Beveridge, 124 N.J. Eq. 24 (E. & A. 1938); Pancho Realty, &c., v. Hoboken Land, &c., Co., 132 N.J. Eq. 15 (E. & A. 1942).
In an attempt to demonstrate that the restrictive covenant has been abandoned or modified, the defendants introduced testimony and photographs showing what they deemed to be violations exhibiting such intent.
The southerly end of said area is the Atlantic Ocean. The next two successive streets to the north running eastwardly and westwardly are Atlantic Avenue and Ventnor Parkway.
As a result of the evidence adduced at trial, and the inspection above referred to, I find the following:
The westerly end of the area included within the bounds of the land restricted by the neighborhood scheme is at a point half-way between Vendome Avenue and Wilson Avenue. Proceeding eastwardly from this point, the area encompasses Union, Thurlow and Sumner Avenues, as well as six other streets.
There are located between Ventnor Parkway on the north, the Atlantic Ocean on the south, Sumner Avenue on the east and the said point between Wilson and Vendome Avenues on the west, some 132 lots.
*559 In this section the defendants have asserted the following violations of the covenant on the following streets:
1. Sumner Avenue: 109 South Sumner Avenue, a picket fence some three feet in height, running parallel to Sumner Avenue for a distance of 151 feet, some 2 feet 7 inches eastwardly of the sidewalk.
108 South Sumner Avenue, a brick wall some six feet in height, running parallel to Sumner Avenue for a distance of 50 feet adjacent to the westerly edge of the sidewalk.
2. Thurlow Avenue: 14 South Thurlow Avenue, a three rail fence some three feet in height, running parallel to Thurlow Avenue for a distance of 46 feet 7 inches adjacent to the westerly edge of the sidewalk.
109 South Thurlow Avenue, a brick wall or coping not in excess of two feet in height, running parallel to Thurlow Avenue for a distance of 50 feet 6 inches, some 10 feet 9 inches eastwardly of the sidewalk.
110 South Thurlow Avenue, a picket fence some three feet in height, running parallel to Thurlow Avenue for a distance of 78 feet 7 inches, some 2 feet 7 inches eastwardly of the sidewalk.
3. Union Avenue: 108 South Union Avenue, a brick wall some four feet in height, running parallel to Union Avenue for a distance of 53 feet 1 inch, some 6 feet 4 inches eastwardly of the sidewalk.
4. Vendome Avenue: 108-110 South Vendome Avenue, a cinderblock retaining wall not in excess of two feet in height above the established lot grade, running parallel to Vendome Avenue, some 100 feet adjacent to the sidewalk.
The alleged violations existing at 109 South Thurlow Avenue and 108-110 South Vendome Avenue are so inconsequential as to be almost negligible. The total frontage of the houses where all of the alleged violations exist, including 109 South Thurlow Avenue and 108-110 South Vendome Avenue, is 690 feet, with a total frontage of all property in this section of approximately 7280 feet.
*560 Of the alleged violations above adverted to by the defendants in the 3 1/2 blocks westwardly from Sumner Avenue, and between Ventnor Parkway and Atlantic Avenue, encompassing 69 lots of 3920 feet frontage, there has been exhibited only one alleged violation, namely, 14 South Thurlow Avenue.
The balance of said alleged violations in this 3 1/2 block section exist on properties between Atlantic Avenue and the Atlantic Ocean. Of these, the following are properties located directly on the beach: 108 South Sumner Avenue, 110 South Thurlow Avenue, 108 South Union Avenue and 108-110 South Vendome Avenue.
It is to be noted that the majority of the houses adjacent to and adjoining the beach have walls constructed oceanward as a protection against the inroads of the waves during times of storm, and that the fences on the street side of these properties are more or less a continuation of their protective ocean walls. Even in this section of the neighborhood plan there are only two fences which are at all comparable to defendants' solid masonry construction. The balance are open picket or rail fences built of wood, and not at all like the defendants' wall.
On the entire Atlantic Avenue frontage, on both sides of the street in the restricted area, a distance of 2880 feet on each side of the street, there is only one fence which would seem to violate the restrictive covenant, and this is a split rail fence consisting of two rails, located at Osborne and Atlantic Avenues, extending along Atlantic Avenue 74 feet 8 inches. This is five blocks eastwardly of Thurlow Avenue and the defendants' property.
The closest fence to the defendants' property on Union Avenue (108 South Union Avenue) is located at the beach, which is across Atlantic Avenue and some 350 feet southwardly from the defendants' southerly property line. The sole violations allegedly existing at Thurlow Avenue (109 and 110 South Thurlow Avenue), one of which is negligible, are approximately 550 feet southwardly from defendants' *561 southerly property line and across Atlantic Avenue adjacent to the Atlantic Ocean, and 14 South Thurlow Avenue, which is approximately 225 feet from defendants' northerly property line. There are no other fences on Thurlow Avenue, and there is none on Union Avenue between Ventnor Parkway and Atlantic Avenue.
Defendants have as well shown some scattered violations on properties further removed from their lots than those above specified. Few of these approximate the type of construction that the defendants have undertaken, and all are too far removed to be considered in the same locality or section as the properties of the plaintiffs and defendants.
There have been no violations which have been shown to have affected the defendants in any substantial way. On Union Avenue between Ventnor Parkway and Atlantic Avenue there are no alleged violations. As stated in Polhemus v. De Lisle, 98 N.J. Eq. 256 (Ch. 1925), the "small number of violations (is) an indication of the general adherence to the original plan."
I find, therefore, that there was not sufficient evidence of violations as to constitute or indicate either a change in the neighborhood or an attempt on the part of the property owners to abandon or modify the scheme.
The defense that the plaintiffs have failed to establish a right to maintain this action is without merit, for the evidence has shown that there was a conveyance from the Harris' to Margate Company and that the titles of both the plaintiffs and the defendants have their origin out of the Margate Company.
There seems as well no merit to defendants' contention that the provision relating to fences is unenforceable.
By way of defense, defendants also argue that the plaintiffs are, in any event, barred by their laches.
Laches, in order to create an estoppel to enforce restrictive covenants, must be based upon the violation sought to be prevented. It is not the duty of a person who has become entitled to enforce a restrictive covenant to watch the *562 progress of a building operation in the anticipation that someone is planning to violate such covenants. Loudenslager v. Pacific Improvement Co., 93 N.J. Eq. 218 (E. & A. 1921); Camp v. Krulewitch, 97 N.J. Eq. 384 (E. & A. 1925); Riverton Country Club v. Thomas, 141 N.J. Eq. 435 (Ch. 1948), opinion below affirmed 1 N.J. 508 (1948).
There was absent any proof that these plaintiffs had knowledge of the contemplated violation.
In addition, the question of laches in the attempted enforcement of a restrictive covenant must turn upon the facts present in each individual case. Mere delay in bringing an action does not, in and of itself, constitute laches. Although some work was done on the wall in May 1951, there was no violation of the restriction until July 1951, nor any indication of a contemplated violation. For all that one viewing the premises knew until July 1951, the defendants contemplated a structure conforming to the covenant requirements. The actual construction was commenced on July 2, 1951 and the wall was completed in a period of three days. During some period of this time it was not visually apparent that the wall would exceed 18 inches in height. On July 5, 1951 the structure was a fait accompli. The plaintiffs could have done nothing to have prevented the breach of the covenant after that date. Although the plaintiffs' conduct might not be classed as unduly hasty, it was at the least most expeditious. Under the circumstances, I find that the plaintiffs acted with the speed and dispatch required, considering all of the circumstances.
The defendants had at least constructive notice of the restrictions. Under the circumstances, the conduct of the plaintiffs did not lull them into any false sense of security or belief that the plaintiffs acquiesced in what they were doing. They cannot complain that because of their own alacrity in completing construction, the plaintiffs did not undertake to prevent a violation of the restrictive covenant before its completion.
*563 Therefore, in view of the lack of proof of any knowledge by the plaintiffs prior to the completion of the building of the wall, and my finding that under the circumstances the plaintiffs acted, in any event, within a reasonable time, I find them not guilty of laches.
In accordance with the foregoing, an injunction will issue commanding the defendants to desist from further construction of said wall and to remove so much thereof as is in excess of 18 inches in height.