211 N.J. Super. 644 (1986)
512 A.2d 553
WALTER BLAINE AND HERBERT R. PORTER, JR., PLAINTIFFS-RESPONDENTS,
v.
WILLIAM J. RITGER, DEFENDANT-APPELLANT, AND THE BOROUGH OF SEA GIRT, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued March 25, 1986.
Decided July 8, 1986.
*647 Before Judges GAULKIN, DEIGHAN and STERN.
James D. Carton, III argued the cause for appellant (Carton, Nary, Witt & Arvanitis, attorneys).
James S. Rothschild, Jr. argued the cause for respondents (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; James S. Rothschild and Peter G. McDonough, on the brief).
The opinion of the court was delivered by GAULKIN, J.A.D.
Plaintiffs Walter Blaine (Blaine) and Herbert R. Porter, Jr. (Porter) were awarded judgment requiring defendant William J. Ritger (Ritger) to remove his beachfront house, located in the Borough of Sea Girt, "to a spot where no part of it is closer *648 than seventy-five (75) feet to the westerly line of Ocean Avenue." That relief was granted upon the trial judge's finding that Ritger had built his house in violation of a restriction imposed as part of a common scheme for the benefit of, and enforceable by, his neighbors. Ritger appeals.
Each of the parties owns property which fronts, to the east, on a paper street variously known as Ocean Avenue, Atlantic Avenue or the Boulevard, in Sea Girt. Since that street has never been improved, the lots actually front on the Atlantic Ocean. The properties are part of a tract acquired in 1875 by the Sea Girt Land Improvement Company (Company), which mapped the land for residential development. The prime portion of the tract consisted of the lots fronting on the Atlantic Ocean. In a map filed by the Company those were designated, from south to north, as Lots 1 through 30 in Block 7; each of the lots had a frontage of 50 feet and a depth of 200 feet, with the exception of lots 15 and 16, which were 62.5 feet wide. To the west a large park area was reserved. That area, known as Crescent Park, has been maintained to date in its natural state; private access to the Block 7 lots is reserved to their owners through that Park.
In 1875 and 1876, the Company conveyed out Lots 1, 2, 4, 5, 6, 9, 10, 11, 12, and 13 by deeds, all of which contained the following setback restriction:
that the line of any building erected thereon shall be distant not less than 25 feet from the Boulevard in front of said lots.
Lots 7, 8, 20 and 21 were conveyed in 1875 by deeds which did not contain any setback restriction.
In 1877 the Company filed an amended map of the tract, which moved the paper street 50 feet to the east. That amendment resulted in the expansion of the unsold lots to a depth of 250 feet. Then, in 1878, the Company entered into an agreement to convey an additional 50 feet to each of the prior purchasers. The Company covenanted with those prior purchasers that it

*649 will permit no houses or buildings to be erected or built in front of said Crescent Park on a line further east than those already erected and built by Elliston P. Morris [i.e., Lots 20 and 21] and Yarnall and Cooper [i.e., Lots 7 and 8] and will make all conveyances of said lots in front of said Crescent Park and between it and said Atlantic Boulevard subject to a covenant restricting the owners thereof to said building line.
Although Lots 7, 8, 20 and 21 had not been burdened by any setback restriction in the 1875 deeds, the 1879 Company deeds which conveyed the additional 50 foot depths recited those grantees' covenants
that he or they shall never build on said premises within eighty feet from the front line thereof.
Based on that history, the trial judge properly concluded that as of 1879 all of the previously conveyed lots, other than lots 7, 8, 20 and 21, were burdened with a 75 foot setback from the new westerly line of Atlantic (Ocean) Avenue, i.e., 25 feet from the old westerly line; that lots 7, 8, 20 and 21 were burdened with an 80 foot setback from the new westerly line; and that the Company had covenanted to restrict building of houses on the unsold lots any further east than those already built on lots 7, 8, 20 and 21. The clear purpose of the restrictions was, as the trial judge found, to preserve an unobstructed view for each of the owners over the ocean to the north and to the south.
The Company conveyed all of its remaining lots by 1890. All of the deeds but two contained the following language:
That no ... building further east than the houses now erected in front of said [Crescent Park] on said Atlantic Avenue ... shall ever be erected or used upon the above described lot of ground.
By two deeds dated June 10, 1889, the Company conveyed to Samuel B. Huey part of lot 16, part of lot 17, lot 24 and part of lot 25; neither of those deeds recited any setback restrictions. Title to lots 16 and 17 ultimately became vested in Edwin I. Kilbourne, who also owned the adjoining lots 18 through 22 and the southerly portion of lot 23; his house was set back 181 feet from Ocean Avenue. In 1959 Kilbourne sold lots 16 and 17, which were then vacant, to Blaine, subject to a restriction that "there shall not be erected on the premises any dwelling house any part of which is easterly of a line" which at all points is at *650 least 81.95 feet west of Ocean Avenue. Blaine subsequently built his house well behind that setback line.[1] Accordingly, lots 16 and 17 are now subject to, and have been developed in accordance with, setback restrictions essentially comparable to those originally imposed by the Company. Lot 24 and the portion of lot 25 originally conveyed to Huey are the only properties in the entire tract which do not have any setback restriction in the chain of title; the houses on those lots, however, are set back 70 and 72 feet respectively.
Porter is now the owner of lots 14 and 15 and Blaine owns lots 16 and 17, immediately north of Porter. Ritger adjoins Blaine on the north, owning lots 18, 19 and the southerly 45 feet of lot 20, for a total frontage of 145 feet. Ritger obtained municipal approval to subdivide his property into a northerly lot of a 70 foot width and a southerly lot of 75 foot width. Ritger built his house on the northerly lot, set back 42.59 feet from the westerly line of Ocean Avenue. The building is located entirely on the property originally designated as lot 20; as already noted, that lot is subject to an 80 foot setback restriction imposed in the 1879 deed from the Company.
The remaining lots have been variously improved over the years. A 1922 survey showed a total of six houses, all set back more than 75 feet from Ocean Avenue, excepting for one house set back 66.5 feet; apparently all of those buildings have been demolished. The 30 lots are now improved with a total of 20 homes. Seven are set back substantially more than 75 feet from Ocean Avenue; two are set back at 73 feet, one at 72 feet, one at 70 feet, three at 68 feet, one at 61 feet, one at 60 feet, one at 59.7 feet, one at 59 feet, one at 55 feet and Ritger's house at 42.59 feet.
*651 From these facts the trial judge concluded that all 30 lots were subject to a common scheme for the benefit of all of the neighbors, that the common scheme had not been abandoned, and that Blaine and Porter had standing to enforce the common scheme. Finding that Ritger's house "sticks out like the proverbial `sore thumb'", the judge ordered Ritger to resite his house to conform with the common scheme.

I.
Ritger first argues that "there is no common neighborhood scheme" because "there was no uniform restriction imposed by the developer on all of the lots." He points out that four lots or portions of lots (the Huey lots) were conveyed by the Company without any setback restriction at all, that six lots have an 80 foot setback restriction, that four lots have a restriction against building further east than buildings erected prior to 1878 and long since gone, and that ten lots are subject to a 25 foot setback from a now-abandoned Atlantic Avenue.
Whether the original developer had intended to create a general neighborhood scheme "is a question of fact to be answered not only by the wording of the deeds but the surrounding circumstances and the acts of the parties." Humphreys v. Ibach, 110 N.J. Eq. 647, 652 (E. & A. 1932). The trial judge's finding of such an intent here is amply supported by the record. Indeed, the Company's imposition of setback restrictions on all of the lots it had sold and its correlative covenant to similarly burden all of its remaining unsold lots makes that finding virtually unavoidable. See Scull v. Eilenberg, 94 N.J. Eq. 759, 771 (E. & A. 1923); Margate Park Protective Ass'n. v. Abate, 22 N.J. Super. 550, 554 (Ch.Div. 1952).
But the finding of intent does not end the inquiry. To be effective, a neighborhood scheme must be "(a) universal, the restrictions applying to all lots of like character brought within the scheme; (b) reciprocal, the restrictions constituting a benefit to all lots involved which are subject to the burden imposed; *652 (c) reasonably uniform as to the restrictions imposed; they need not be identical but any variations must be such as not to create an inequitable burden or benefit." Olson v. Jantausch, 44 N.J. Super. 380, 386 (App.Div. 1957). We find no merit to Ritger's contention that the setback restrictions are unenforceable because they are not "reasonably uniform": although the restrictions imposed on the various lots are not identical, they are sufficiently congruent to create like burdens and benefits. Cf. Olson, 44 N.J. Super. at 386; Humphreys, 110 N.J. Eq. at 653. The fact that the common grantor did not include setback restrictions in the conveyances of the Huey lots, however, raises the question whether the attempted neighborhood scheme was "universal" and "reciprocal."
The reasons for requiring restrictions to be "universal" and "reciprocal" were set forth in Scull, 94 N.J. Eq. at 762-63:
A neighborhood scheme of restrictions to be effective and enforceable must have certain characteristics. It must be universal, that is, the restrictions must apply to all lots of like character brought within the scheme. Unless it be universal it cannot be reciprocal. If it be not reciprocal, then it must as a neighborhood scheme fall, for the theory which sustains a scheme or plan of this character is that the restrictions are a benefit to all. The consideration to each lot owner for the imposition of the restriction upon his lot is that the same restrictions are imposed upon the lots of others similarly situated. If the restrictions upon all lots similarly located are not alike, or if some lots are not subject to the restrictions while others are, then a burden would be carried by some owners without a corresponding benefit.
Nevertheless, even a complete omission of restrictions from some deeds may not defeat a common plan "where the plan has been maintained from its inception and has been understood, accepted, relied and acted upon by all interested parties." 5 Powell on Real Property, § 672, p. 60-28 (1985); see also II American Law of Property, § 9.29, p. 419 (1952). That principle found application in Weinstein v. Schwartz, 3 N.J. 80, 88 (1949), where the Supreme Court sustained a neighborhood scheme and enforced a restriction against business use notwithstanding that a portion of the property with 150 feet of street frontage was not subjected to the restriction; the court concluded that the omission of the restriction from that portion *653 of the property was "inadvertent," that in fact the unrestricted portion had not been used for business purposes and that the omission thus did not constitute "such a departure from the general neighborhood scheme as to nullify its operation." See also Morrow v. Hasselman, 69 N.J. Eq. 612, 618-19 (Ch. 1905), in which the court found that the conveyance of a portion of a tract without setback restrictions had not "destroyed entirely the general plan" of setback restrictions where the grantee had in fact "continued to carry out the original plan." Whether the omission of restrictions from certain deeds was inadvertent or purposive, the critical inquiry is whether the omissions substantially destroy the general scheme. If a general scheme has been imposed and maintained, the omission of restrictions in some deeds will not permit a lot owner to subvert that scheme by violating the restrictions appearing in his own chain of title.[2]See, generally, Annot., "Who may enforce restrictive covenant or agreement as to use of real property," 51 A.L.R.3d 556, § 9(h), pp. 641-43 (1973); Annot., "Omission from deed of restrictive covenant imposed by general plan of subdivision," 4 A.L.R.2d 1364 (1949).
Here the Company clearly intended to impose a neighborhood scheme; it imposed similar setback restrictions on all the properties except the four Huey lots or portions; the owners of those lots have at all times accepted, relied upon and acted in accordance with the setback restrictions. Those facts justify the conclusion that the common scheme imposes universal, reciprocal and uniform restrictions. Accordingly, we have no difficulty in sustaining the trial judge's holdings that the neighborhood scheme was effective and that Blaine and Porter have standing to enforce the restriction imposed upon Ritger's lot 20 by the 1879 deed.

*654 II.
Ritger next urges that any neighborhood scheme has been abandoned; he relies upon the fact that 12 of the existing houses are less than 75 feet from Ocean Avenue and that the others "are set back so far as to not take advantage of the view of the ocean." The trial judge rejected the contention. He found that there had been "no wholesale disregard of the building set-back" and that "[w]here there has been some slippage it is attributable to a reluctance of one neighbor to sue another where the intrusion was so slight as not to cause major concern."
Those factual findings are amply supported by the record; there is no warrant for us to disturb them. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-84 (1974). They fully justify the conclusion that the neighborhood scheme has not been abandoned. The criteria by which to evaluate the abandonment claim were summarized in LaFetra v. Beveridge, 124 N.J. Eq. 24 (E. & A. 1938):
As to abandonment of the neighborhood scheme, minor violations do not necessarily indicate an abandonment, nor impair complainant's right to enforce it. Before violations can constitute an abandonment they must be so general as to indicate either a change in the neighborhood or a clear intent on the part of the property owners generally to abandon the original plan. None of the violations testified to have in any way affected complainant's enjoyment of his property according to the original plan. At 31-32.
Although the proofs show that a number of houses breach the 75 foot setback line, most of those intrusions are of seven feet or less. Moreover, as the trial judge suggested, neither those nor the few more extensive intrusions are so situated that they significantly impair others' ocean views, the preservation of which was the principal aim of the restrictions. There is accordingly no sound basis to conclude that the violations of the restrictions were so widespread or significant as to "indicate either a change in the neighborhood or a clear intent on the part of the property owners generally to abandon the original plan." Ibid.; see also Margate Park Protective Ass'n., 22 N.J. Super. at 558; Morrow, 69 N.J. Eq. at 616. Indeed, the fact *655 that only modest deviations in the setbacks have occurred over more than a century "tends to the establishment of the fact that it has been the defined purpose of the property holders in that district to adhere to the preservation of the original plan sought to be preserved by the covenant." Barton v. Slifer, 72 N.J. Eq. 812, 818 (Ch. 1907). See also Polhemus v. DeLisle, 98 N.J. Eq. 256, 271 (Ch. 1925). Rather than proving an abandonment of the scheme, the pattern of development thus conduces to the conclusion that Ritger "was charged with notice of the community scheme, and that he is bound to observe its ordinances." Shoyer v. Mermelstein, 93 N.J. Eq. 56, 61 (Ch. 1921).

III.
Ritger finally contends that principles of estoppel and laches should bar Blaine and Porter from any relief. We find those contentions unpersuasive.
The estoppel argument is based, first, on the fact that the Blaine property is formally burdened only by the 1959 Kilbourne restriction; but in light of that restriction, its conformity with the neighborhood scheme and the fact that the Blaine property has been developed in keeping with both the restriction and the scheme, we find no reason to invoke the principle relied upon by Ritger that "one who is not bound by a restriction or who has violated that restriction himself may not ask a Court of Equity to enforce it against his neighbors." Nor is there merit in Ritger's further contentions (1) that Porter should be estopped because his own setback is only 68 feet and (2) that both Porter and Blaine should be estopped because they failed to take "any action to prohibit the construction of the numerous houses in Crescent Park with setbacks of less than 75 feet." As already noted, the setback violations of the Porter and other properties are of modest proportion; the failure of Blaine and Porter, in common with the other neighbors, to enjoin minor violations which did not affect them in any substantial way or defeat the purposes of the common scheme does *656 not disentitle them from relief against Ritger's far more substantial and harmful intrusion. Cf. Bowen v. Smith, 76 N.J. Eq. 456, 462-63 (Ch. 1909).
In support of his laches argument, Ritger urges that Porter had learned of the fact and location of the proposed construction in late March 1984 and that both Porter and Blaine "stood by ... and commenced no legal proceedings until the house was, for all practical purposes, finished." The trial judge found, however, that Ritger's own conduct made the invocation of the laches bar inappropriate:
Ritger on the other hand pressed on with his construction with knowledge of the "Kilbourne" restriction (and based on legal advice that it did not affect lot 20) and despite the obvious physical fact that his house would jut forward of all others in Block 7 and impede the view of both Blaine and Porter. That physical fact, together with the restrictive language appearing in his chaim of title was sufficient, I find, to put him on notice that there was a potential set-back problem transcending that of the zoning ordinance and "Kilbourne" restriction which a prudent man would address before a very large expenditure of money.
We find those observations to be persuasive. Cf. Shoyer, 93 N.J. Eq. at 61 (where the "distinctive character" of the neighborhood was observable, the property owner had a "duty to have informed himself" of the reason before building a conflicting structure). Moreover, we note that, although the present action was not filed until June 18, 1984, notice of Blaine's objection was given to Ritger by letter dated April 25, 1984. Blaine and Porter did not lull Ritger into any false sense of security or belief that they acquiesced in what he was doing; Ritger cannot fairly complain that "because of [his] own alacrity in completing construction, [Blaine and Porter] did not undertake to prevent a violation of the restrictive covenant before its completion." Margate Park Protective Ass'n., 22 N.J. Super. at 562. As nicely put in Lamonte, 97 N.J. Eq. at 429:
It must not be forgotten that the defendant was the wrongdoer (even if he were not acting in bad faith), and that unreasonably stringent requirements as to celerity in bringing suit are not to be imposed on complainants who are innocent and injured parties, no matter how much money defendant may spend in the interim after notice and warning.
The judgment is affirmed.
NOTES
[1] At trial Blaine and Porter unsuccessfully contended that the "Kilbourne restriction" extended to lot 20, on which Ritger's house is built. That contention is not pressed in this court.
[2] Indeed, restrictions may apply to a lot even though they do not appear at all in the chain of title, where there is a general scheme and the grantee has actual notice thereof before his purchase. See, e.g., Lamonte v. Orlando, 97 N.J. Eq. 425 (Ch. 1925).