686 A.2d 1226

ALFRED HOMANN, MARIE HOMANN, AUGUSTUS C. BUZBY, DERITH B. BUZBY, GLEN P. SAMPSON, SANDRA T. SAMPSON, DARCEL SANGIACOMOTANO, EUGENE D. TANO, CHARLES F. PRATT, GAIL H. PRATT, WILLIAM THOMAS SCHLUTH, JEAN SCHLUTH, STEPHEN M. WILUS AND PATRICIA A. WILUS, PLAINTIFFS–RESPONDENTS, v. WARREN TORCHINSKY, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued December 10, 1996—Decided January 13, 1997.

Before Judges MICHELS, KLEINER and COBURN.

*Patrick F. McAndrew* argued the cause for appellant.

*Jeffrey I. Baron* argued the cause for respondents (*Baron & Riefberg,* attorneys; *Mr. Baron,* of counsel; *Barbara E. Riefberg,* on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Defendant Dr. Warren Torchinsky appeals from a judgment of the Chancery Division which enforced the restrictive covenant in a deed concerning a neighborhood scheme plan covering his property in the Birchwood Lake residential development in Medford Township, New Jersey, and restrained him from conducting his oral surgery practice in his home except for medical emergencies.

Defendant purchased a home in the Birchwood Lakes development on August 15, 1994. Birchwood Lakes is a private residential community, consisting of approximately 198 homes. The subdivision plan for Birchwood Lakes was filed in September 1953 by Timber Lakes Corporation, a New Jersey corporation. By deed dated November 12, 1953, Timber Lakes Corporation transferred the property which was subsequently acquired by Dr. Torchinsky to Dr. Charles F. Kutteroff, Sr. and Louise Kutteroff, his wife. The 1953 deed to the property included certain "Covenants and Restrictions" imposed by Timber Lakes Corporation which ran with the land and bound the purchasers, their heirs, successors, and assigns. The Covenants and Restrictions, in pertinent part, provided:

> Under and subject to the following covenants and restrictions which shall run with the land and shall bind the purchasers, their heirs, successors and assigns, until September 1, 1978, after which time said covenants and restrictions shall be automatically extended for successive periods of ten years until abrogated by a duly recorded agreement executed by the owners of a majority of the area affected by the said restrictions, which are binding as to all lots as shown on presently filed plans of Birchwood Lakes, Medford Township, Burlington County, New Jersey, excepting thereout the area shown on said plans as recreation areas and land which may now or hereafter belong to Birchwood Lakes Colony Club.
>
> No. 1—No lot shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot other than one (1) detached single or duplex family dwelling not to exceed two families and not to exceed one and one-half stories in height with a private attached garage for not more than three (3) cars.
>
> . . . .
>
> No. 7—No structure of a temporary character, trailer, basement, tent, shack, garage, barn or other out building shall be used on any lot at any time as a residence, either temporarily or permanently, and no gasoline or oil stations or other business structure shall be used or erected on any lot.

....

No. 9—No sign of any kind shall be displayed to the public view on any lot except one professional sign of not more than one square foot, one sign of not more than five square feet advertising the property for sale or rent, or signs used by a builder to advertise the property during the construction and sales period, or a decorative signboard with the name of the residence or its owner inscribed thereon.

Dr. Kutteroff, who was a physician, cut back on his private practice after he purchased the property. However, he continued to treat patients in his home, which had an office. In February 1973, Dr. Kutteroff and his wife sold the property to a husband and wife, Thomas R. Sandman and Madeleine A. Sandman. The Sandmans never used the property for any nonresidential purpose. In August 1994, the Sandmans sold the property to Dr. Torchinsky.

Dr. Torchinsky is a dentist with a specialty in oral and maxillofacial surgery. He maintains his principal office in Pennsauken, New Jersey. The Pennsauken office consists of three operating rooms, two of which are equipped like hospital operating rooms, with electrocardiographic monitoring equipment and a defibrillator, and permit the doctor to perform general anesthesia. Dr. Torchinsky also has large X-ray equipment, to do panoramic radiographs, and a developing room. The Pennsauken office also has a private office for Dr. Torchinsky, a business area for the manager, and a waiting room with ten chairs. These offices occupy approximately 1,000 square feet. The doctor employs two full-time and three part-time staff, including an office manager. He has a chair-side assistant who does suctioning, cleans instruments, seats patients, and performs other general work related to oral and maxillofacial surgery. His part-time employees do the same thing. Dr. Torchinsky practices oral surgery three full days and one half day at the Pennsauken office. Dr. Torchinsky also practices oral surgery for Health Insurance Plan (HIP) of New Jersey on a contractual basis, using the latter's facility in Cherry Hill, New Jersey.

After he purchased the Birchwood Lakes property, Dr. Torchinsky applied to the Medford Township Planning Board for a home

occupation conditional use permit to operate a part-time oral surgery practice in his home; he also sought a waiver of the required minor site plan. The Medford Township Zoning Code § 403(B)(5) restricts available "[h]ome [o]ccupations as [c]onditional [u]ses" to various uses including the "[p]rofessional office of a . . . dentist. . . ."

On September 26, 1994, the Planning Board approved Dr. Torchinsky's conditional use permit and waived the site plan requirement. The Planning Board's resolution limited Dr. Torchinsky's accessory home occupation use to an ancillary office of no more than 20% of the entire residential structure with the understanding that the doctor's principal office for oral surgery would remain in Pennsauken, New Jersey. It also limited the maximum number of routine hours to approximately ten per week with specific daily limits as well. Under the terms of the resolution, Dr. Torchinsky could only see one patient at a time for a minimum of one-half hour. The resolution, however, permitted Dr. Torchinsky to see patients on an emergency basis. Finally, the resolution waived any site · plan requirement because Dr. Torchinsky did not propose exterior alterations.

When Dr. Torchinsky opened his oral surgery office in his home, plaintiffs instituted this action in the Law Division by filing a complaint in lieu of prerogative writs against the Medford Township Planning Board and Dr. Torchinsky seeking to restrain the use of the doctor's home as an office for the practice of oral surgery. Before an answer was filed by Dr. Torchinsky, the trial court entered a consent order that dismissed the action against the Planning Board and transferred the matter to the Chancery Division. Thereafter, Dr. Torchinsky filed an answer and then moved for summary judgment on the issue of whether his home oral surgical practice was prohibited by the Covenants and Restrictions. The trial court denied the motion and the matter proceeded to trial.

At the conclusion of the proofs, Judge Gottlieb in the Chancery Division held that plaintiffs had "proven clearly and convincingly

that [Dr.] Torchinsky's non-residential use of his [p]roperty is too intense to be incidental to the residential use of the property," and violated the "Neighborhood Scheme" established by the Covenants and Restrictions that ran with the property. In reaching this conclusion the trial court found that the goal of the Covenants and Restrictions was clearly to establish a neighborhood scheme, that is, a single-family, lakeside residential community. The trial court determined that inconsistencies in the covenants between the residential use restriction and the additional specific prohibition on gas stations was the result of an "amateur hour" drafting, and that the express sanction for professional signs was only an effort to promote "snob appeal" for a community of professional families and that such sanctions indicated neither acceptance of nor opinion regarding professional home offices. Finally, the trial court found that the neighborhood scheme had not been abandoned despite some infractions over the years. However, in this regard the trial court strongly warned the Birchwood Lake community that totally subjective enforcement of the residential covenants based on caprice would not be tolerated. After stating that the development residents were on notice, the trial court continued that "[i]f there is not appropriate action taken [against others who violated the retroactive covenants] ... I will deem it to be purposeful ... and will allow, after an appropriate period of time, Dr. Torchinsky to come back to me and reapply [to use the property for his dental surgery practice]." The trial court thereupon entered judgment permanently restraining Dr. Torchinsky from conducting regular office hours at his property or from seeing patients at his property except for actual medical emergencies. Dr. Torchinsky appealed.

Dr. Torchinsky seeks a reversal of the judgment, the vacation of the injunction, and the entry of a judgment permitting him to operate an oral surgical practice nine hours per week in his home at the rate of one patient per half hour as approved by the Planning Board. He contends generally that (1) the trial court inappropriately denied his motion for summary judgment since the relevant facts were uncontroverted and the restrictive covenants were impermissibly vague; (2) the trial court should have reas-

signed the case because reasons existed which would lead the parties and others to believe that a fair and unbiased hearing and judgment would be precluded; (3) the trial court's decision to enjoin him from operating his home dental practice during the routine hours approved by the Planning Board was not supported by the evidence and was contrary to law; and (4) the trial court's refusal to hold open the trial record until Mr. Charles Kutteroff, Jr. was available to testify was an abuse of discretion. We disagree and affirm.

We are satisfied from our study of the record and the arguments presented that the judgment of the trial court is based on findings of fact which are adequately supported by the evidence and that all of the issues of law raised are clearly without merit. *R.* 2:11–3(e)(1)(A) and (E). Accordingly, the judgment under review is affirmed substantially for the reasons expressed by Judge Gottlieb in his thorough oral opinion of October 31, 1995. However, further discussion with respect to some of Dr. Torchinsky's contentions is appropriate.

## I.

Contrary to Dr. Torchinsky's claim, the restrictive covenants were not impermissibly vague and were properly enforced by the trial court. A restrictive covenant, in equity, is enforceable as an equitable servitude against a subsequent grantee who takes with notice of the restriction. *Caullett v. Stanley Stilwell & Sons, Inc.,* 67 *N.J.Super.* 111, 118, 170 *A.*2d 52 (App.Div.1961). Such notice can be provided by the presence of a restriction on permissible uses in the chain of title. Moreover, the right to enforce a servitude against the burdened land " 'depends primarily on the covenant[ ] having been made for the benefit' of other encumbered land, either retained by the grantor or part of a perceptible neighborhood scheme." *Petersen v. Beekmere, Inc.* 117 *N.J.Super.* 155, 167–68, 283 *A.*2d 911 (Ch.Div.1971) (quoting *Caullett v. Stanley Stilwell & Sons, Inc., supra,* 67 *N.J.Super.* at 119, 170 *A.*2d 52).

To establish a neighborhood scheme of restriction, the scheme must be:

(a) universal, the restriction applying to all lots of like character brought within the scheme; (b) reciprocal, the restrictions constituting a benefit to all lots involved which are subject to the burden imposed, [and] (c) reasonably uniform as to the restrictions imposed; they need not be identical but any variations must be such as not to create an inequitable burden or benefit.

[*Olson v. Jantausch*, 44 *N.J.Super.* 380, 386, 130 *A.*2d 650 (App.Div.1957).]

*See also, Scull v. Eilenberg,* 94 *N.J. Eq.* 759, 762–63 (E. & A.1923).

The existence of a neighborhood scheme "is a question of fact to be answered not only by the wording of the deeds but by the surrounding circumstances and the acts of the parties." *Weinstein v. Swartz,* 3 *N.J.* 80, 85–86, 68 *A.*2d 865 (1949) (quoting from *McComb v. Hanly,* 128 *N.J.Eq.* 316, 16 *A.*2d 74 (Ch.1940)), *rev'd on other grounds,* 132 *N.J.Eq.* 182, 26 *A.*2d 891 (E. & A.1942).

Generally, "[a] restrictive covenant is a contract." *Id.* at 86, 68 *A.*2d 865. The polestar of contract construction is to find the intention of the parties as revealed by the language used by them. *Jacobs v. Great Pac. Century Corp.,* 104 *N.J.* 580, 582, 518 *A.*2d 223 (1986); *Atlantic N. Airlines, Inc. v. Schwimmer,* 12 *N.J.* 293, 301, 96 *A.*2d 652 (1953); *Casriel v. King,* 2 *N.J.* 45, 50, 65 *A.*2d 514 (1949). To this end, the language used must be interpreted " 'in accord with justice and common sense.' " *Krosnowski v. Krosnowski,* 22 *N.J.* 376, 387, 126 *A.*2d 182 (1956) (citation omitted). As our Supreme Court noted in *Tessmar v. Grosner,* 23 *N.J.* 193, 201, 128 *A.*2d 467 (1957):

In the quest for the common intention of the parties to a contract the court must consider the relations of the parties, the attendant circumstances, and the objects they were trying to attain. An agreement must be construed in the context of the circumstances under which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose. *Cameron v. International, etc., Union No. 384,* 118 *N.J. Eq.* 11 [176 *A.* 692] (E. & A.1935); *Mantell v. International Plastic Harmonica Corp.,* 141 *N.J.Eq.* 379 [55 *A.*2d 250] (E. & A.1947); *Heuer v. Rubin,* 1 *N.J.* 251 [62 *A.*2d 812] (1949); *Casriel v. King,* 2 *N.J.* 45 [65 *A.*2d 514] (1949); *Owens v. Press Publishing Co.,* 20 *N.J.* 537, 543 [120 *A.*2d 442] (1956).

*See also Jacobs v. Great Pac. Century Corp., supra,* 104 *N.J.* at 582, 518 *A.*2d 223; *Anthony L. Petters Diner, Inc. v. Stellakis,* 202 *N.J.Super.* 11, 28, 493 *A.*2d 1261 (App.Div.1985); *Bruenn v. Switlik,* 185 *N.J.Super.* 97, 105, 447 *A.*2d 583 (App.Div.), *certif. denied,* 91 *N.J.* 536, 453 *A.*2d 857 (1982); *Insurance Co. of State of Pa. v. Palmieri,* 81 *N.J.Super.* 170, 179, 195 *A.*2d 205 (App.Div. 1963), *certif. denied,* 41 *N.J.* 389, 197 *A.*2d 15 (1964); *Union County U–Drive It v. Blomeley,* 48 *N.J.Super.* 252, 256, 137 *A.*2d 428 (App.Div.1958).

■   Generally, in the context of restrictive covenants, a rule of strict construction should be applied to the provisions, unless such a rule would defeat the obvious purpose of the restrictions. *Murphy v. Trapani,* 255 *N.J.Super.* 65, 72, 604 *A.*2d 635 (App. Div.), *certif. denied,* 130 *N.J.* 17, 611 *A.*2d 655 (1992); *see also Bruno v. Hanna,* 63 *N.J.Super.* 282, 285–87, 164 *A.*2d 647 (App. Div.1960). In such a case, "[t]he precise form of a covenant is of little consequence if the intent is reasonably clear, and its apparent purpose should not be defeated by a technical construction of the language used." *Murphy v. Trapani, supra,* 255 *N.J.Super.* at 72, 604 *A.*2d 635 (citing *Broad & Branford Place Corp. v. J.J. Hockenjos Co.,* 132 *N.J.L.* 229, 236, 39 *A.*2d 80 (Sup.Ct.1944)).

Also, where an ambiguity appears in a written agreement, the writing is to be strictly construed against the party preparing it. *See In re Miller's Estate,* 90 *N.J.* 210, 221, 447 *A.*2d 549 (1982); *Liqui–Box Corp. v. Estate of Elkman,* 238 *N.J.Super.* 588, 599, 570 *A.*2d 472 (App.Div.), *certif. denied,* 122 *N.J.* 142, 584 *A.*2d 214 (1990). This rule of construction is also somewhat tempered by the principle that although "a contractual provision should generally be construed narrowly against the drafter, the construction should be sensible and in conformity with the expressed intent of the parties." *Broadway Maintenance Corp. v. Rutgers, The State Univ.,* 90 *N.J.* 253, 271, 447 *A.*2d 906 (1982) (citation omitted). Hence,

[e]ven where the intention is doubtful or obscure, the most fair and reasonable construction, imputing the least hardship on either of the contracting parties,

should be adopted so that neither will have an unfair or unreasonable advantage over the other.

[*Tessmar v. Grosner, supra,* 23 *N.J* at 201, 128 *A.*2d 467 (citations omitted).]

Further, "absent 'explicit indication of a special meaning' words must be given their ordinary meaning." *Shadow Lake Village Condominium Ass'n, Inc. v. Zampella,* 238 *N.J.Super.* 132, 139, 569 *A.*2d 288 (App.Div.1990) (quoting *In re Barnert Memorial Hosp. Rates,* 92 *N.J.* 31, 40, 455 *A.*2d 469 (1983)). "Where the terms of a contract are clear and unambiguous there is no room for interpretation or construction" and the courts must enforce those terms as written. *Levison v. Weintraub,* 215 *N.J.Super.* 273, 276, 521 *A.*2d 909 (App.Div.), *certif. denied,* 107 *N.J.* 650, 527 *A.*2d 470 (1987). *See also Kampf v. Franklin Life Ins. Co.,* 33 *N.J.* 36, 43, 161 *A.*2d 717 (1960). The court has no right "to rewrite the contract merely because one might conclude that it might well have been functionally desirable to draft it differently." *Brick Tp. Mun. Util. Auth. v. Diversified R. B. & T. Const. Co.,* 171 *N.J.Super.* 397, 402, 409 *A.*2d 806 (App.Div.1979). Nor may the courts remake a contract better than the parties "themselves have seen fit to enter into, or alter it for the benefit of one party to the detriment of the other." *James v. Federal Ins. Co.,* 5 *N.J.* 21, 24, 73 *A.*2d 720 (1950).

■. A neighborhood scheme embodied in a covenant can be terminated when its provisions are abandoned by those holding other burdened properties. In *Blaine v. Ritger,* 211 *N.J.Super.* 644, 654–55, 512 *A.*2d 553 (App.Div.), *certif. denied,* 105 *N.J.* 546, 523 *A.*2d 183 (1986), we explained:

The criteria by which to evaluate the abandonment claim were summarized in *LaFetra v. Beveridge,* 124 *N.J.Eq.* 24 [199 *A.* 70] (E. & A.1938):

As to abandonment of the neighborhood scheme, minor violations do not necessarily indicate an abandonment, nor impair complainant's right to enforce it. Before violations can constitute an abandonment they must be so general as to indicate either a change in the neighborhood or a clear intent on the part of the property owners generally to abandon the original plan. None of the violations testified to have in any way affected complainant's enjoyment of his property according to the original plan. At 31–32 [199 *A.* 70].

... There is accordingly no sound basis to conclude that the violations of the restrictions were so widespread or significant as to "indicate either a change in the

neighborhood or a clear intent on the part of the property owners generally to abandon the original plan." *Ibid.; see also Margate Park Protective Ass'n [v. Abate],* 22 *N.J.Super.* [550] at 558 [92 *A.2d* 110 (1952)]; *Morrow [v. Hasselman],* 69 *N.J.Eq.* [612] at 616 [61 *A.* 369 (Ch.1905)] Indeed, the fact that only modest deviations in the setbacks have occurred over more than a century "tends to the establishment of the fact that it has been the defined purpose of the property holders in that district to adhere to the preservation of the original plan sought to be preserved by the covenant." *Barton v. Slifer,* 72 *N.J. Eq.* 812, 818 [66 *A.* 899] (Ch.1907). *See also Polhemus v. DeLisle,* 98 *N.J. Eq.* 256, 271 [130 *A.* 618] (Ch.1925). Rather than proving an abandonment of the scheme, the pattern of development thus conduces to the conclusion that Ritger "was charged with notice of the community scheme, and that he is bound to observe its ordinances." *Shoyer v. Mermelstein,* 93 *N.J. Eq.* [57] 56, 61 [114 *A.* 788] (Ch.1921).

Application of these principles compels the conclusion that the restrictive covenants in the original deed from Timber Lakes Corporation to Dr. Kutteroff and his wife were part of a neighborhood scheme to preserve the residential character of the Birchwood Lakes development. These covenants ran with the property and were enforceable as an equitable servitude against the property. Moreover, they were enforceable against all other property in the development.

The neighborhood scheme in Birchwood Lakes has continued to exist. It has not been changed or abrogated by a duly recorded agreement executed by the owners of a majority of the residences in the development affected by the restriction and, therefore, was properly enforceable against Dr. Torchinsky. Dr. Torchinsky acquired title to the property with notice of the Covenants and Restrictions in his chain of title. Moreover, the commitment for title insurance and the ultimate title policy charged him with notice thereof. Additionally, and more importantly, Dr. Torchinsky had actual knowledge of the Covenants and Restrictions.

The terms of Paragraph No. 1 of the Covenants and Restrictions provide that "[N]o lot shall be used except for residential purposes." This language is clear, explicit, and unambiguous. Contrary to Dr. Torchinsky's argument, the language is neither vague nor ambiguous. It plainly prohibits Dr. Torchinsky, as well as all other residents of Birchwood Lakes, from using the property for anything other than residential purposes. Dr. Torchinsky's

use of his home for the practice of oral surgery is not a residential use. Dr. Torchinsky's use of his home for an oral surgery office violated not only the letter but also the spirit of the restrictive covenants that ran with and bound his property and the neighborhood scheme established thereby.

█ Furthermore, contrary to Dr. Torchinsky's claim, the neighborhood scheme in Birchwood Lakes has not been abandoned by virtue of violations of the restrictive covenants by a few property owners in the development. The past isolated instances of violation of the covenant against using the property for other than residential purposes do not indicate a change in the neighborhood scheme or establish a clear intent on the part of the property owners to abandon the neighborhood scheme for the development. To the contrary, the proofs show an intent on the part of the property owners to uphold the neighborhood scheme. According to Max Bierberbach, the president the Birchwood Lakes Colony Club, an association of the homeowners in the development, the association was created to maintain standards within the community and to see that the Covenants and Restrictions governing the property were upheld. Although Mr. Bierberbach was aware of some past violations, he testified that there was a limited budget to bring enforcement actions against those property owners who infringed upon or violated the covenants. In sum, the trial court properly enjoined Dr. Torchinsky from conducting his oral surgery practice in his home except for medical emergencies.

## II.

█ Dr. Torchinsky also contends that the trial judge should have recused himself because, although he did not live in the same residential development, he lived in Medford Township and his property was subject to the same municipal ordinance. Dr. Torchinsky also contends that the trial judge in a previous matrimonial action referred to him in "Yiddish as a wise guy, apparently expressing some view as to his credibility." Dr. Torchinsky argues that it was reversible error for the trial judge not to

disclose these facts early in the proceeding and to deny his motion to request the reassignment of the case pursuant to *R.* 1:12–1(e) and (f).

*R.* 1:12–1, which sets forth the standards for disqualification of a judge, provides:

The judge of any court shall be disqualified on the court's own motion and shall not sit in any matter, if the judge

(a) is by blood or marriage the second cousin of or is more closely related to any party to the action;

(b) is by blood or marriage the first cousin of or is more closely related to any attorney in the action. This proscription shall extend to the partners, employers, employees or office associates of any such attorney except where the Chief Justice for good cause otherwise permits;

(c) has been attorney of record or counsel in the action; or

(d) has given an opinion upon a matter in question in the action; or

(e) is interested in the event of the action; or

(f) when there is any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so.

Paragraph (c), (d) and (e) shall not prevent a judge from sitting because of having given an opinion in another action in which the same matter in controversy came in question or given an opinion on any question in controversy in the pending action in the course of previous proceedings therein, or because the board of chosen freeholders of a county or the municipality in which the judge resides or is liable to be taxed are or may be parties to the record or otherwise interested.

*R.* 1:12–2, which deals with the disqualification of a judge on a party's motion, provides:

Any party, on motion made before trial or argument and stating the reasons therefor, may apply to a judge for his disqualification.

We have set forth principles that help guide the decision as to whether a judge should be disqualified in a particular matter. In *Johnson v. Salem Corp.,* 189 *N.J.Super.* 50, 60–61, 458 *A.*2d 1290 (App.Div.1983), *aff'd as modified,* 97 *N.J.* 78, 477 *A.*2d 1246 (1984), we explained:

A judge ordinarily is not disqualifiable because of his own life experiences. Obviously a judge is not disqualified from presiding at an automobile accident trial merely because he was once himself in an automobile accident. Nor is a judge disqualified from trying a divorce case either because he is himself married or divorced, or from trying a contested adoption case because he has either natural children or adopted children. The point, of course, is that each of us is a product of

the aggregate of our experiences, and our understanding is enhanced by the totality of our experiences. There may, of course, be a specific situation which would render it appropriate for a judge to recuse himself in a particular case. *See, e.g., R.* 1:12–1(f).

There is nothing in this record which remotely suggests that the trial judge was prejudiced against Dr. Torchinsky or that the trial judge should have recused himself in this case. None of the reasons advanced by Dr. Torchinsky demonstrate that the trial judge was unfit to hear this case or that the trial judge was in any way prejudiced against Dr. Torchinsky. While the geographical coincidence of the proximity of the trial judge's residence is apparently accurate, the trial judge did not live in the Birchwood Lake development and there is nothing in the record to show or even suggest that the trial judge's property was subject to the same restrictive covenants that bound Dr. Torchinsky's property in the Birchwood Lake development. The comment concerning the trial judge's reference in Yiddish to Dr. Torchinsky as a wise guy, apparently suggesting some view as to the doctor's credibility, is unsupported by the record and, in any event, would not serve as a basis to disqualify the trial judge. This record does not even remotely suggest that either the letter or spirit of *R.* 1:12–1 was violated by the trial judge in this case.

## III.

Finally, we are satisfied that the trial court did not abuse its discretion by not holding open the record or adjourning the trial to enable Mr. Kutteroff, the son of Dr. Kutteroff and one of the original developers of Birchwood Lakes, to testify. New Jersey courts follow the "time-honored rule that the procedural conduct of a trial rests in the sound discretion of the trial judge and that no reversal will follow except for an abuse of that discretion." *Moksvold v. Meyers,* 130 *N.J.Super.* 481, 484, 327 *A.*2d 681 (App.Div.1974) (citing *Munson v. Johnson,* 110 *N.J.L.* 564, 166 *A.* 102 (E. & A.1933)). *See also Italian Fisherman, Inc. v. Commercial Union Assurance Co.,* 215 *N.J.Super.* 278, 286, 521 *A.*2d 912 (App.Div.), *certif. denied,* 107 *N.J.* 152, 526 *A.*2d 211

(1987). Here, Dr. Torchinsky did not advise the court of the unavailability of Mr. Kutteroff until three days into the trial. In any event, Mr. Kutteroff's deposition, although not taken by Dr. Torchinsky's attorney, was admitted into evidence. There is no basis to conclude on this record that the trial court abused its discretion by not holding open the record or adjourning the trial until Mr. Kutteroff became available.

Affirmed.