155 A.3d 17

JESSICA PEARSON, JOHN T. MCEVOY, MARY PURCELL, JOHN S.
FOSTER, JR., ELIZABETH K. FOSTER, STEVEN DAVID SHOR-
TEN, ELIZABETH JESSIE SHORTEN, SHARON OLSON, JAN-
ET O. MARANGI, TERRANCE MOORE, KIM SHAFER, ETHAN
BARSHAY, SANDRA KROUSE, REBEKAH RADISCH, DEBO-
RAH L. RADISCH AND INGRID ELIZABETH EWERTZ WHA-
LEY, PLAINTIFFS, v. DMH 2 LIMITED LIABILITY COMPANY,
DEFENDANT.

Superior Court of New Jersey
Chancery Division
Essex County

Decided: August 16, 2016

32

34

*Steven R. Tombalakian, Esq.* for plaintiff (*Weiner Lesniak LLP*, attorneys).

*Michael D. Malloy, Esq., Russell M. Finestein, Esq.* for defendant (*Finestein & Malloy, LLC*, attorneys).

MOORE, THOMAS M., J.S.C.

INTRODUCTION:

This matter comes to the court by way of motion and cross-motion for summary judgment. These motions require the court to determine whether a restrictive covenant prohibiting commercial use, recorded in the chain of title to 200 Bloomfield Avenue, Verona, New Jersey is enforceable against the present property owner. Having reviewed the submissions of the parties and having heard the arguments of counsel on the record on July 28, 2016, the following constitutes the decision of the court.

BACKGROUND:

On June 5, 2012, DMH 2 Limited Liability Company ("defendant") purchased the properties located at 176 and 200 Bloomfield

Avenue ("the Property" or "200 Bloomfield") in Verona, New Jersey for $375,000 from Ella Theting. Before closing title to the property, defendant ordered a title insurance commitment from Heritage Abstract Company; the title commitment, and the subsequent title policy, did not disclose any restrictions against commercial use on the property. Defendant planned to develop the property for a mixed use residential and commercial project. The property defendant purchased is located within Verona's Extended Town Center Zone ("ETC")—a zoning designation that: (1) permits retail, office and commercial use; (2) permits residential development as a conditional use only; and (3) prohibits single-family residential use entirely. A free-standing single-family home is presently situated on 200 Bloomfield.

During a Verona Planning Board hearing on August 22, 2013, defendant was advised by plaintiff John T. McEvoy that the chain of title to 200 Bloomfield Avenue contained certain restrictive covenants prohibiting commercial use. It is defendant's position that, prior to this conversation with McEvoy, they were entirely unaware of any use restriction on their property.

In 2013, defendant apparently failed to get site plan approval from the planning board; however, a subsequent application was approved on June 17, 2015. Within one month of the site-plan approval, a coalition of "nearby property owners and local residents,"[1] ("plaintiffs") commenced the present action seeking to enforce restrictive covenants contained in the chain of title to 200 Bloomfield to prevent the planned development.

A. Chain of Title for 200 Bloomfield Ave. and Surrounding Neighborhood:

Deciding the motions presently before the court requires an understanding of both the chain of title for 200 Bloomfield Avenue, as well as the development of the surrounding neighborhood.

---

[1] The plaintiffs also include members of the Condit and Stonham families—the original grantor and a previous owner in the chain of title respectively.

On April 4, 1890, The Equitable Life Assurance Society of the United States conveyed to Fillmore Everett Condit ("Condit") a large tract of land in what is today the Township of Verona. This conveyance was memorialized, in part, by a map entitled "Map of Property of Fillmore Condit in the Township of Caldwell."[2] This map was recorded in 1890 (the "1890 Plat") and encompassed approximately 47 lots lying between Bloomfield Avenue on the South and Claremont Avenue on the North. The lot referred to today as 200 Bloomfield was designated as Lot 9 in Condit's 1890 Plat, and is situated on the corner of Bloomfield Avenue and Westview Road. The 1890 Plat also reserves a large swath of undivided property along Bloomfield Avenue, lying between Westview Road on the East and Elmwood Road on the West, as "the Lawn." The area designated as "the Lawn" in the 1890 Plat is known today as Everett Field.

Following the 1890 conveyance into Condit, a number of relevant transfers occurred. These transfers fall into one of two categories and are significant either in relation to 200 Bloomfield itself or the 1890 Plat at large. The first set of transfers detailed below relate specifically to the chain of title for 200 Bloomfield. The following transfers, drawn from plaintiffs' statement of material facts, are not in dispute:

1. On August 9, 1890, Condit conveyed 200 Bloomfield to Henry Starkweather.
2. On October 7, 1892, Starkweather conveyed the property back to Condit.
3. On July 27, 1893, Condit conveyed the property to Florence White; this conveyance contained language stating: "this conveyance is made expressly subject to the restrictions that the premises shall not be used for commercial or manufacturing purposes and the parties of the first part [Condit] bind themselves and their heirs and assigns, that a plot of land [referring to the "Lawn" which is now Everett Field] shall be perpetually reserved for common purposes as a park or pleasure ground."[3]

---

[2] Today, the lots are part of Verona, though at the time were apparently part of the township of Caldwell.

[3] Though not discussed in depth by the parties, the deed language does not explicitly state that the restriction on commercial use is perpetual; it simply says

4. On October 24, 1895, White conveyed the property to Elizabeth Esther Lund, subject to the restrictions in the 1893 deed.

5. On July 20, 1898, Lund conveyed the property to Arthur Stonham, "subject to the restrictions in said two deeds mentioned."

6. On August 20, 1920, Stonham conveyed the property to Sarah A. O'Connor, "expressly subject to the restriction that the premises shall not be used for commercial or manufacturing purposes."

7. On January 31, 1923, O'Connor conveyed the property to Ruth Schlieman, "expressly subject to the restriction that the premises shall not be used for commercial or manufacturing purposes."

8. On July 7, 1923, Schlieman conveyed the property to Mathilde L. Burfiend. The deed evidencing this conveyance, in addition to restating the restriction related to commercial/manufacturing purposes, further stated that the grantee would not construct any factory or stables on the premises.

9. On January 29, 1934, during the Great Depression, the property was conveyed by deed of foreclosure to Arthur Vanderbilt, Bank Trustee. This deed is notable because, instead of specifically detailing the restrictions as earlier deeds did, it simply states that it was conveyed "subject to all . . . restrictions of record." None of the subsequent deeds make explicit reference to the nature of the restrictions.

10. On April 18, 1938, the property was conveyed to Lincoln Mortgage Company.

11. On June 16, 1942, Lincoln Mortgage conveyed the property to Ella and Katharina Theting, "subject to . . . restrictions of record, if any."

12. On June 27, 1985, Ella Theting conveyed her interest in the property to her sister Katharina, "subject to . . . covenants and restrictions affecting said premises of record."

13. After Katharina died, her remaining interest was conveyed back to Ella Theting.

14. Finally, on June 5, 2012, Ella Theting conveyed the property to the defendant in this case, "Subject to . . . restrictions of record."

In addition to the specific chain of title for 200 Bloomfield, plaintiffs have made note of certain conveyances by Condit related to other lots in the 1890 Plat that they deem significant. First, on December 25, 1890, Condit and his wife conveyed Lot 17 on the 1890 Plat. In the deed for that conveyance, the Condits included the following covenant upon themselves:

[T]his conveyance is made expressly subject to the following restrictions: no building to be erected upon said premises nearer than twenty five feet to Westview Road nor shall any dwelling be erected thereon costing less than twenty five

---

that the Lawn will be a park in perpetuity. The actual use restriction on 200 Bloomfield, however, does not allude to any timeframe.

hundred dollars <u>nor shall any building be used for commercial or manufacturing purposes within ten years from the date of this conveyance</u> and the parties of the first part <u>[the Condits] hereby bind themselves that all other lots hereafter sold or conveyed by them shall be conveyed subject to the same restrictions.</u>

Thus, in conveying Lot 17, the Condits promised that all other lots conveyed by them would be subject to the restriction that no building on such lots could be used for commercial or manufacturing purposes for ten years. Though the conveyance of Lot 17 only required a ten-year restriction, plaintiffs have argued that the evidence supports a finding that Condit subsequently eliminated the ten-year limitation in favor of perpetual restrictions. For this proposition, they maintain that a number of subsequent deeds along Elmwood and Westview Roads, including the deed to 200 Bloomfield, contained restrictions without specific time limitations, including lots 37, 38, 13, and 14 on the 1890 Plat. Plaintiffs have taken the position that, viewed together, these conveyances are evidence that Condit intended to and succeeded in creating a neighborhood scheme of restrictions that barred commercial use on the properties in the 1890 Plat.

Though defendant does not dispute that these lots were transferred in the manner suggested by plaintiffs, they dispute the conclusion plaintiffs draw from them. To that end, defendant maintains that according to its expert's review of the chains of title for: (1) all of the lots adjacent to the Lawn, (2) all of the lots fronting Bloomfield Ave., and (3) the Lawn itself, a substantial number of deeds do not include "perpetual restrictions," and instead contain either restrictions of limited duration (ten or twenty years) or no restrictions at all.

In addition to the conveyance of certain individual lots, plaintiffs also call attention to Condit's April 15, 1910, conveyance of "the Lawn," now Everett Field, to the Township of Verona. The deed into Verona, which states nominal consideration of $1, contains the following restrictive language:

This conveyance is made and accepted expressly subject to the following restrictions and covenant. <u>The property conveyed shall be perpetually kept and maintained for park purposes</u> only for the welfare of the community and shall not in any way be diverted or changed from this purpose by the mortgage, sale, lease,

[not clear], or grant of the whole or any part or by the erection of any building or structure excepting such as would be in harmony with and suitable for park use or ornamentation. If the above restrictions are violated the land hereby conveyed shall revert to the party of the first part or their heirs to be held in accordance with covenants in certain deeds made by them conveying lots adjacent to the above described park land.

Plaintiffs point to this 1910 conveyance's reference to "covenants in certain deeds" adjacent to the park as further evidence of Condit's vision for the neighborhood as exclusively residential.

### B. The Current Make-up of the Neighborhood:

Taking a narrow view of the neighborhood, limited only to those lots bordering Everett Field, plaintiffs have argued that "Condit's 125–year-old vision remains in place today, as this exclusively residential neighborhood has withstood the test of time, remaining almost exactly as contemplated by Condit himself." To this end, plaintiffs maintain that the residential character of the neighborhood surrounding Everett Field, as well as the Field itself remains "intact." Taking a much wider view, defendant disputes plaintiffs' characterization of the neighborhood and points to an additional expert report by Phillips Preiss Grygiel, LLC, a real-estate planning consultant. Using the report, defendant challenges the contention that the neighborhood has remained "residential." It points out that most of the properties along Bloomfield Avenue that were part of the 1890 Plat have been developed commercially—including Condit Lot 34, which is also adjacent to Everett Field and now houses an automobile repair shop. Moreover, defendant maintains the commercial nature of the area—especially as it relates to Bloomfield Avenue—is evidenced by the fact that Verona zoned the property exclusively for commercial use.

Based on the parties' arguments regarding the present makeup of the neighborhood, it may appear as if there is a significant dispute. In reality however, there is little dispute; they merely focus on different aspects of the 1890 Plat. Plaintiffs correctly assert that, with the exception of Condit Lot 34, all of the lots surrounding Everett Field are presently residential. Defendant on the other hand accurately represents that those properties on the

1890 Plat that front Bloomfield Avenue have largely been developed for commercial use.

PROCEDURAL HISTORY:

In response to defendant's planned development of 200 Bloomfield, plaintiffs filed the complaint in this case on July 14, 2015. On September 18, 2015, defendant filed an answer and counterclaim. On October 6, 2015, plaintiffs filed a motion to dismiss defendant's counterclaim for failure to state a claim. On November 2, 2015, defendant opposed plaintiffs' motion and cross-moved to amend the counterclaim, adding a quiet title claim. On November 10, 2015, after entertaining the arguments of counsel, this court rendered a decision on the record whereby defendant's cross-motion to amend was granted and plaintiffs' motion to dismiss the counterclaims was denied.

On December 2, 2015, defendant moved to dismiss plaintiffs' complaint for failure to join necessary parties. On December 8, 2015, plaintiffs opposed defendant's motion and cross-moved to dismiss defendant's counterclaims on the same ground, arguing that in to order quiet title, all persons with a potential claim must be joined. Noting that the risk of multiple litigations ultimately lay with defendant, who sought to quiet title against potential parties whom they had not joined to the action, the court ultimately denied both motions. The court left the parties, specifically defendant, to decide whether they would amend their counterclaim to add all parties with potential claims in order to avoid multiple litigations in the future.

On March 29, 2016, plaintiffs filed the present motion for summary judgment. After a dispute regarding discovery, the court held a phone conference with the parties and adjourned plaintiffs' motion until May 27 in order to allow for further exchange of discovery; the motion was adjourned again until June 10. On May 24, 2016, defendant opposed plaintiffs' motion and cross-moved for summary judgment. Plaintiffs served their reply papers on June 7, 2016. On July 28, 2016, this court entertained the arguments of counsel.

LEGAL STANDARD:

██ Under *Rule* 4:46–2(c), a court should only grant a motion for summary judgment where there are no genuine issues of material fact requiring trial and where the movant is entitled to judgment as a matter of law. *See Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 666 *A.*2d 146 (1995). Summary judgment is a business-like and efficient means of disposing of a dispute without a trial when there are no material issues of fact. *Id.* at 530, 666 *A.*2d 146. In *Brill*, the Court determined that there may only be a ruling in favor of summary judgment when there is no "genuine issue" of material fact. *Id.* at 541, 666 *A.*2d 146. On a motion for summary judgment, the movant bears the burden of demonstrating the absence of material facts in dispute, and the judge must consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational fact-finder to resolve the alleged disputed issue in favor of the non-moving party." *Id.* at 540, 666 *A.*2d 146.

██ Additionally, the "judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Ibid.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 *U.S.* 242, 249, 106 *S.Ct.* 2505, 2511, 91 *L.Ed.*2d 202, 212 (1986)). If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a "genuine" issue of material fact for purposes of summary judgment. *Ibid.* Summary judgment is appropriate when the evidence "is so one-sided that one party must prevail as a matter of law." *Ibid.* Moreover, "[b]are conclusions in the pleadings without factual support in tendered affidavits, will not defeat a meritorious application for summary judgment." *Brae Asset Fund, L.P. v. Newman*, 327 *N.J.Super.* 129, 134, 742 *A.*2d 986 (App. Div. 1999) (citing *United States Pipe & Foundry Co. v. Am. Arbitration Ass'n*, 67 *N.J.Super.* 384, 399–400, 170 *A.*2d 505 (App. Div. 1961)).

LAW AND ANALYSIS:

As a substantive matter, plaintiffs' motion for summary judgment seeking to enforce the covenant, and defendant's cross-motion seeking to find the covenants unenforceable and quieting title, raise identical issues of substantive law and are thus mutually exclusive. Accordingly, there is no need to address the motions independently; the court will simply evaluate the legal issues attendant to each motion.

Plaintiffs essentially raise two distinct, though related, arguments for enforcement. First, they take the position that the restrictions are enforceable as part of a "neighborhood scheme" of restrictions. Additionally, plaintiffs maintain that the restrictions in defendant's chain of title "run with the land" and are thus enforceable as to defendant, whether or not there is a neighborhood scheme. Though these two arguments raise similar legal issues, for clarity's sake they will be addressed independently, beginning with the former.

1. Neighborhood Scheme:

■ The first issue the court faces is whether the restriction against commercial use is enforceable as part of a neighborhood scheme.

■ Whether a neighborhood scheme exists " 'is a question of fact to be answered not only by the wording of the deeds but by the surrounding circumstances and the acts of the parties.' "[4] *Homann v. Torchinsky*, 296 *N.J.Super.* 326, 334, 686 *A.*2d 1226 (App. Div. 1997) (quoting *Weinstein v. Swartz*, 3 *N.J.* 80, 85–86, 68 *A.*2d 865 (1949)). Importantly then, "there must be a clear intent to establish a neighborhood scheme of restrictions." *Olson v.*

---

[4] The case law reiterates this point—that the determination of whether there is a neighborhood scheme is a generally a question of fact. Neither party however, has suggested that this case is not ripe for summary judgment. Moreover, it is not clear what testimony a trial could achieve considering the restriction at issue is more than a century old.

*Jantausch*, 44 *N.J.Super.* 380, 386, 130 *A.*2d 650 (App. Div. 1957). In order to create a neighborhood scheme of restrictions, such scheme must be: (a) universal—applying to all lots of like character brought within the scheme; (b) reciprocal—constituting a benefit to all lots involved which are subject to the burden imposed; and (c) "reasonably uniform as to the restrictions imposed; they need not be identical but any variations must be such as not to create an inequitable burden or benefit." *Homann, supra,* 296 *N.J.Super.* at 334, 686 *A.*2d 1226 (citing *Olson v. Jantausch, supra,* 44 *N.J.Super.* at 386, 130 *A.*2d 650.).

The elements of universality, uniformity, and reciprocity are essential to the neighborhood scheme analysis because

the consideration to each lot owner for the imposition of the restriction upon his lot is that the same restrictions are imposed upon the lots of others similarly situated. If the restrictions upon all lots similarly located are not alike, or if some lots are not subject to the restrictions while others are, then a burden would be carried by some owners without a corresponding benefit.

[*Blaine v. Ritger,* 211 *N.J.Super.* 644, 652, 512 *A.*2d 553 (App. Div. 1986) (quoting *Scull v. Eilenberg,* 94 *N.J. Eq.* 759, 762–63, 121 *A.* 788 (E. & A.1923)).]

 While a "complete omission of restrictions from some deeds may not defeat a common plan," this is so only "where the plan has been maintained from its inception and has been understood, accepted, relied and acted upon by all interested parties." *Ibid.*

Plaintiffs argue that the restrictive covenants in defendant's chain of title are enforceable as part of a neighborhood scheme implemented by Fillmore Condit when he started selling off individual lots in the early 1890s. It should be noted however, that plaintiffs' argument on this point proves to be a bit of a moving target, as they have not been explicit as to whether the relevant neighborhood is the entire 1890 Plat or, instead, just the properties in the immediate vicinity of Everett Field. In either case, their view of the neighborhood scheme begins with the December 25, 1890, deed out of Condit, wherein Condit placed a covenant upon himself that all lots he subsequently conveyed would be barred from commercial use for a period of ten years. Relying on this

initial covenant, plaintiffs go on to argue that subsequent convey-
ances of lots surrounding the Lawn, which contain similar restric-
tions but of an indefinite nature, demonstrate that Condit intended
to transform the ten-year restriction into a perpetual one, barring
commercial development. As further evidence of this point, plain-
tiffs point out that the 1910 deed conveying the Lawn to Verona
refers to "restrictions" placed on adjacent properties.

Defendant has raised two primary objections to plaintiffs' view
of the neighborhood scheme. First, they argue that there is no
neighborhood scheme because the necessary elements of univer-
sality and uniformity of the restrictions are not satisfied. In this
respect, defendant cites the Rizzo Report and points out that: (1)
not every lot was restricted; (2) some were restricted only tempo-
rarily; and (3) that only six (of the twenty-five he searched) had
restrictions against commercial use in perpetuity. Second, defen-
dant insists that even if there was a neighborhood scheme,
changed circumstances have rendered enforcement inequitable.

Having considered the legal arguments of the parties and the
evidence before the court on this record, the court determines that
there is no neighborhood scheme upon which the plaintiffs may
rely in this case.

First, it cannot be ignored that plaintiffs have not even mean-
ingfully defined the scope of the "neighborhood" to which the
purported scheme applies. At times, they limit the scope of the
neighborhood to only those properties immediately adjacent to the
Park. For instance, when addressing the make-up of the neighbor-
hood as it exists today, they dismiss as irrelevant the fact that a
number of Condit Lots with frontage along Bloomfield Avenue are
presently used for commercial purposes. Instead, they focus solely
on the state of those properties that border Everett Field, arguing
that, with the exception of the automotive shop on Condit Lot 34
(also fronting Bloomfield Ave.), the neighborhood remains exclu-
sively residential. Seemingly then, the relevant "neighborhood"
posited by plaintiffs is limited singularly to those properties that
abut the Lawn. Notably, however, in presenting their theory that

Condit intended to create a neighborhood scheme of reciprocal convents, plaintiffs start by relying on the December 25, 1890, conveyance of Lot 17—a lot, which does not border the Lawn. Furthermore, the covenant in the deed to Lot 17 states that "all other lots hereafter sold or conveyed by them shall be conveyed subject to the same restrictions," including the ten-year restriction on commercial use. The covenant in the deed to Lot 17 thus relates, unambiguously, to all other lots in the 1890 Plat thereafter conveyed by Condit, not just to those lots bearing a certain proximity to the Lawn.

If plaintiffs wish to rely on the deed to Condit Lot 17 as the basis for their neighborhood scheme, they cannot simply ignore the fact that doing so requires that their vision be applied to all subsequently conveyed lots in the 1890 Plat—including those without frontage on the Lawn that are presently used for commercial purposes. Plaintiffs instead use the deed to Lot 17 to demonstrate Condit's intent to develop a scheme of reciprocal covenants but then selectively impute that reciprocal purpose only upon certain, later-in-time, covenants that restrict commercial use indefinitely, based on a lot's proximity to the Lawn. Importantly, none of the language in the post–1893 deeds relied upon by plaintiffs for the conclusion that Condit "changed course" and restricted commercial use around the park in perpetuity contain a promise by Condit, as the 1890 deed to Lot 17 does, to encumber all similarly situated lots adjacent to the Lawn, which he later conveyed. Rather, in the post–1893 deeds the relevant burden upon Condit was that he would permanently maintain the "Lawn" as a "park or pleasure ground." Thus, the only explicitly "reciprocal" language vis-à-vis the individual Condit Lots is found in the 1890 conveyance of Lot 17, and it applied to all subsequently conveyed lots, irrespective of their relation the Lawn. In sum then, plaintiffs rely on the deed to Lot 17 when it is convenient (i.e. serving to demonstrate an intent to establish a scheme of reciprocal covenants) and simply ignore it when it is not convenient (i.e. when doing so would require a more expansive view of the relevant neighborhood).

The absence of a clearly defined neighborhood also ties into a more pressing deficiency in plaintiffs' position: there is simply a lack of universality and uniformity with respect to the restrictions imposed. *See Homann, supra,* 296 *N.J.Super.* at 334, 686 *A.*2d 1226. This conclusion holds whether the neighborhood is construed narrowly—to those lots adjacent to the Lawn or expansively—to all lots in the 1890 Plat. Beginning with the former, as the Rizzo Report indicates, only a limited number of the title chains to lots surrounding the Lawn (just a little over half) actually include deed restrictions against commercial use for an indefinite period.[5] Some contain no restrictions whatsoever, while others included restrictions of an expressly limited duration, long since expired. Though plaintiffs argue that after 1893 Condit "changed course" and reconveyed all subsequent deeds with perpetual restrictions on commercial use, they have not provided evidence related to every conveyance after 1893, or at least they have not explicitly certified that those conveyances which they actually have relied upon constitute all post–1893 deeds out of Condit. Even if they had, it would not change the fact that those properties deeded out of Condit before 1893 as well as those conveyed prior to the December 25, 1890, conveyance of Lot 17, contained either no restrictions at all or contained restrictions whose effective period was only ten years—a far cry from the perpetual restrictions that plaintiffs maintain the purported neighborhood scheme requires. This is thus not a case where only a very small subset of the lots were inadvertently left unencumbered or where the restrictions were subject to only minor variation from lot to lot. Rather, a substantial number of the relevant deed chains contain no restrictions at all, or contain restrictions that expired as early as a century ago.

---

[5] The court is including Condit Lots 11 and 12 in this calculation, but Rizzo states that while the deeds to lots 11 and 12 contain restrictions for residential use, only such restrictions are subject to Verona's zoning ordinance and were not contained in the deed out of Condit. Their inclusion in the court's tally is thus perhaps over-inclusive, but does not impact upon the reasoning.

The court also notes that the 1910 deed conveying the Lawn to Verona hints at a recognition by Condit himself that the surrounding lots were not uniformly restricted. This deed states that if the Lawn were ever used for non-park purposes, it would revert to the Grantors or their heirs "to be held in accordance with covenants in <u>certain</u> deeds made by them conveying lots adjacent to the above described park land" (emphasis added). The reference to "certain" lots, as opposed to "all of," "each of," or simply "the" lots, is consistent with the reality that the restrictions imposed upon the properties adjacent to the Lawn were neither uniform nor universal.

It is thus the conclusion of this court that there is a complete absence of uniformity or universality of restrictions as it relates to those lots surrounding the park. Absent a reciprocal scheme of uniform and universally applicable restrictive covenants memorialized in the relevant chains of title, the fact that this narrowly construed neighborhood has essentially remained residential over the last century is, in large part, irrelevant. A neighborhood scheme must be rooted in actual restrictions on record, not in an incidental pattern of development.

The same conclusion holds when the relevant neighborhood is construed broadly to include all lots in the 1890 Plat. In this respect, defendant maintains, and plaintiffs concede, that Condit Lots 4–8 along Bloomfield Avenue are entirely without deed restrictions in their title chains while lots 1–3, also along Bloomfield Avenue, contain long expired ten- or twenty-year restrictions. Though the court is without any information regarding the remainder of those Condit Lots that do not border Everett Field (16–31 and 41–47), the mere fact that lots 1–8 along Bloomfield Avenue have different restrictions than the subject property here is significant. In fact, of the ten Condit Lots with frontage on Bloomfield Avenue, <u>only</u> the deed chain to Lot 9 (200 Bloomfield) contains a so-called "perpetual" restriction against commercial use. This is problematic because, as the court recognized in *Ritger*, "[i]f the restrictions upon all lots <u>similarly located</u> are not alike, or

if some lots are not subject to the restrictions while others are, then a burden would be carried by some owners without a corresponding benefit." *Ritger, supra,* 211 *N.J.Super.* at 652, 512 *A.*2d 553.

In this regard then, it is particularly significant that Condit Lot 34 is the only lot sharing the key characteristics of present day 200 Bloomfield. Condit Lot 34 is a corner lot with frontage on both Bloomfield Ave and Everett Field. As previously noted, lot 34 contains no deed restriction on commercial use and presently houses an automotive shop on a since-subdivided, corner portion of the previous Condit lot. Thus, the single lot bearing the key geographical characteristics of 200 Bloomfield, as it relates to plaintiffs' purported neighborhood scheme, not only has no commercial use restriction in its deed chain—it is presently being used for a commercial purpose.

Accordingly, whether the neighborhood is viewed narrowly or broadly, the restriction against commercial use is neither universal in its imposition nor uniform in application. The court therefore cannot find that there is a neighborhood plan of restrictions upon which plaintiffs may rely to enforce the commercial use restriction in the title to 200 Bloomfield.

### 2. The Deed Restrictions as they Relate to Defendant's Chain of Title:

Plaintiffs also argue that, separate and apart from any neighborhood scheme, the restrictions of record in the title to 200 Bloomfield prohibit commercial use and that these restrictions "run with the land," such that they are not a personal covenant only enforceable by the common grantor. Defendant does not dispute this legal principle or the conclusion that the restriction could run with the land, but has levied a number of other attacks, which are addressed below.

### a. Notice:

Under New Jersey law, "[a] grantor may, by covenant in a deed, restrict the use of land conveyed for the benefit of land

retained and bind the grantee and his or her successors in title who take with notice." *Perelman v. Casiello*, 392 *N.J.Super.* 412, 418, 920 *A.2d* 782 (2007) (emphasis added). A subsequent purchaser/grantee will be charged with record notice (i.e. constructive notice) of a restriction if such a restriction is present in their chain of title; this is so even if that grantee's deed itself contains no mention of such a restriction. *See Olson, supra*, 44 *N.J.Super.* at 388, 130 *A.2d* 650; *Hammett v. Rosensohn*, 46 *N.J.Super.* 527, 535, 135 *A.2d* 6 (App. Div. 1957). In addition to constructive/record notice contained in a chain of title, a party may be charged with inquiry notice where there are facts or circumstances indicating some outside claim that would prompt a reasonable purchaser to investigate further. *See e.g., Friendship Manor, Inc. v. Greiman*, 244 *N.J.Super.* 104, 108, 581 *A.2d* 893 (App. Div. 1990).

In the present case, defendant has not argued that the restrictions against commercial use are in any way absent from the chain of title to 200 Bloomfield Ave or that they are otherwise misindexed in some fashion such that discovery was impossible. Instead, defendant has argued that a bona fide purchaser, such as itself, can only be charged with constructive notice of those instruments in their chain of title that would be disclosed by a "reasonable search of the records." A "reasonable" search, defendant argues, is one that goes back at least sixty years—the customary search period relied upon by title searchers. Secondarily, defendant asks the court to take judicial notice of the fact that "canned" language, such as "subject to easements and restrictions of record," is extremely common in deeds and can thus be disregarded because it is of no practical value. Defendant maintains that in the present case: (1) the title search did not reveal any restriction against commercial use, (2) the restriction relied upon by plaintiffs has not been stated with any specificity for well over sixty years, since the 1923 deed into Mathilde L. Burfiend, and (3) that it otherwise had no notice of any restrictions. In sum, defendant insists that it cannot be found to have taken title with any notice of the restriction.

Plaintiffs respond to this argument by pointing out that defendant has not cited any binding authority to support the conclusion that a buyer, as a matter of law, will only be charged with constructive notice of restrictions in his own chain of title if such restrictions have been specifically stated within the previous sixty years. Instead, they reiterate the principle that purchasers are charged with notice of all restrictions properly recorded in their chain of title. Moreover, plaintiffs argue that: (1) the restrictions are stated in every deed in the chain, including defendant's, even if those deeds after 1923 only reference them by stating that grantee takes title "subject to restrictions of record;" and (2) that even if the reference to "restrictions of record" did not specifically constitute notice—it at least constitutes "inquiry notice," because it should have raised suspicions such that a search further back than sixty years was necessary.

The court agrees with plaintiffs that defendant took title to 200 Bloomfield with record notice of the restrictions contained in its chain of title, even though their title search did not reveal the restrictions. As stated above, a grantee will be charged with notice of those restrictions present and discoverable in their chain of title, even if their deed does not, itself, state such restrictions. *See Olson, supra,* 44 *N.J.Super.* at 388, 130 *A.2d* 650. It is undisputed that the chain of title to 200 Bloomfield contains a specific restriction against commercial uses, which was stated with specificity as late as 1923. Likewise, none of the deeds in this chain of title was improperly indexed or otherwise difficult to locate. Defendant simply asserts that it can only be charged with notice of restrictions that a "reasonable title search would reveal" and that a reasonable title search need not go back further than sixty years.

While the court is willing to accept that it may be the general practice of title searchers to go back only sixty years, it cannot find that there is any binding authority establishing a bright line rule that purchasers cannot be charged with record notice of restrictions unless they have been recorded with specificity in the

previous sixty years. In this respect, defendant merely relies on *Palamarg* and argues that the Court implied a sixty-year search was reasonable. *Palamarg Realty Co. v. Rehac*, 80 *N.J.* 446, 456, 404 *A.*2d 21 (1979). This argument fails. First, it must be noted that the circumstances dealt with in *Palamarg* are entirely distinct from the present. There, the Court was faced with <u>competing</u> chains of title emanating from a common grantor and considered whether a more thorough title search could have put a party on <u>inquiry notice</u> of that competing title chain. Here, there is only one chain: defendant's. Moreover, the *Palamarg* Court specifically noted the lack of binding authority on the issue of "reasonable" search practices and explicitly left unanswered the question of whether a sixty-year search was, per se, reasonable. *Palamarg, supra*, 80 *N.J.* at 460–61, 404 *A.*2d 21.

To a large extent, the court also agrees with plaintiffs that, as a practical matter, the standard of a sixty-year search is the product of a calculated risk by title searchers; they are essentially insuring against the possibility that no restrictions will appear in a chain of title more than sixty years back. While this risk likely pays off in most cases, it is nonetheless still a risk they take. This court does not believe that the business practice—a calculated risk assessment—should be relied upon to undermine the effectiveness of validly recorded instruments in a chain of title. As the *Palamarg* Court itself instructed, "[A] court should decide a question of title ... in the way that will best support and maintain the integrity of the recording system." *Id.* at 446, 404 *A.*2d 21.

Finally, defendant's argument against notice also glosses over a key fact: the deed to defendant explicitly states that title is being taken subject to all restrictions of record. Defendant has taken the position that a mere statement that title is taken "subject to restrictions of record" is too generic to have any practical value in a title search. While the court acknowledges that recitations such as the one dealt with here are common in deeds, it cannot find, as the defendant insists, that such language can simply be disregard-

ed out of hand. Defendant has, again, failed to direct the court to any binding authority for the proposition that, as a rule, the language "subject to restrictions of record" is entirely without any legal effect. Absent such authority, it would be improper for the court to disregard such clear contractual language. Instead, the provision states that defendant took title subject to the restrictions of record, which included a restriction against commercial use.

Unequivocally then, defendant should be charged with constructive notice of the restriction against commercial use recorded in its chain of title despite the fact that the restriction had not been restated with specificity in the sixty years prior to purchase.

b. Unreasonable Restraint on Alienability:

Defendant argues that the covenant against commercial use cannot be enforced because it is an unreasonable restraint on alienability.

There is, as defendant states, a policy of this State against restrictions on land that expressly limits the alienability of property. *See Ierrobino v. Megaro,* 108 *N.J.Super.* 556, 262 *A.*2d 17 (Ch. Div. 1970). Relying on this principle, defendant makes the argument that because 200 Bloomfield is zoned <u>exclusively</u> for commercial use, a deed restriction that prevents such use effectively renders the property undevelopable and the title unmarketable— thus unreasonably restraining alienability.

Defendant's argument in this regard, however, also fails. The actual restrictions in the chain of title to 200 Bloomfield do not restrain alienability—they limit use. Thus, they do not expressly restrict defendant's right to sell or otherwise dispose of this property. While the paradoxical relationship between the restraint on commercial development and the present-day zoning of the property creates the problematic circumstance whereby strict compliance with both is impossible, the reality is that 200 Bloomfield undoubtedly constitutes a pre-existing non-conforming use not subject to strict observance of the zoning restriction. *See Town*

of *Belleville v. Parrillo's, Inc.*, 83 *N.J.* 309, 315, 416 *A.*2d 388 (1980). But while the covenant is not, in a strict sense, void as a restraint on alienability, the conflict between the current zoning and the commercial use restriction will ultimately prove relevant in the "reasonableness" analysis undertaken directly below.

c. The Davidson Test:

The final inquiry, as defendant frames it, presents the issue not of whether the restrictions, in the abstract are enforceable, but instead whether, under the circumstances presented, the restrictions should be enforced. This is because a finding that "plaintiff has the right to enforce the restrictive covenant does not end the inquiry;" rather, courts must consider "whether plaintiff's conduct, changed circumstances or the relevant equities preclude enforcement" of the covenant. *Perelman supra*, 392 *N.J.Super.* at 423, 920 *A.*2d 782. On this point, the parties have agreed that, in determining the enforceability of a restrictive covenant, New Jersey courts apply the "reasonableness" analysis established by the Supreme Court in *Davidson Bros. v. D. Katz & Sons, Inc.*, 121 *N.J.* 196, 579 *A.*2d 288 (1990).

In *Davidson Bros.*, the Court was faced with the issue of whether a restrictive covenant against the use of a property as a supermarket (a covenant not to compete) could run with the land. Eschewing the long-applied and byzantine "touch and concern" analysis, the Court followed the trend in other jurisdictions and held that the appropriate analysis was one of "reasonableness." In so holding, the Court stated, "Reasonableness, not esoteric concepts of property law, should be the guiding inquiry into the validity of covenants at law." *Id.* at 210, 579 *A.*2d 288. Thus, as it applied to the covenant in that case, the Court reasoned "[a] 'reasonableness' test allows a court to consider the enforceability of a covenant in view of the realities of today's commercial world [6]

---

[6] While this "commercial world" language may seem particularly appropriate in this case, it must be noted that the covenants dealt with in *Davidson Bros.*

and not in the light of out-moded theories developed in a vastly different commercial environment." *Ibid.* The Court provided a list of eight factors for courts to consider in determining the reasonability of enforcing a covenant running with the land. Those factors are:

1. The intention of the parties when the covenant was executed, and whether the parties had a viable purpose which did not at the time interfere with existing commercial laws, such as antitrust laws, or public policy.

2. Whether the covenant had an impact on the considerations exchanged when the covenant was originally executed. This may provide a measure of the value to the parties of the covenant at the time.

3. Whether the covenant clearly and expressly sets forth the restrictions.

4. Whether the covenant was in writing, recorded, and if so, whether the subsequent grantee had actual notice of the covenant.

5. Whether the covenant is reasonable concerning area, time or duration. Covenants that extend for perpetuity or beyond the terms of a lease may often be unreasonable.

6. Whether the covenant imposes an unreasonable restraint on trade or secures a monopoly for the covenanter. This may be the case in areas where there is limited space available to conduct certain business activities and a covenant not to compete burdens all or most available locales to prevent them from competing in such an activity.

7. Whether the covenant interferes with the public interest.

8. Whether, even if the covenant was reasonable at the time it was executed, 'changed circumstances' now make the covenant unreasonable.

[*Id.* at 211–12, 579 *A.*2d 288.]

Applying the *Davidson Bros.* analysis to the covenant in question here, this court concludes that the restriction against commercial use recorded in the chain of title to 200 Bloomfield Avenue is unreasonable and should not be enforced.

The court is compelled to begin this analysis by pointing out that while both sides reference *Davidson Bros.*, neither take the position that the "reasonableness" analysis cannot be resolved at summary judgment. This is despite the fact that *Davidson Bros.*

were explicitly commercial—not residential—as here. There the Court was dealing with a covenant not to build a grocery store on the property that was included in the deed because the original Grantor owned a nearby grocery store that he was hoping to protect from competition.

itself states: "[t]he fact-sensitive nature of a 'reasonableness' analysis make resolution of this dispute through summary judgment inappropriate." *Davidson Bros., supra,* 121 *N.J.* at 215, 579 *A.*2d 288. At oral argument on the present motion, the parties indicated their belief that resolution on summary judgment was appropriate, though counsel for plaintiffs seemed to hint that their position might be limited to their own motion—not to defendant's. In either event, this court is confident that, under the circumstances and despite the Court's warning in *Davidson Bros.,* summary judgment is appropriate here.

First, the *Davidson Bros.* analysis is necessary to both motions. The restrictions can neither be deemed enforceable nor unenforceable without a determination of reasonability by this court. Second, it is not clear how trial would put the court in any better a position to decide the merits of this case. In *Davidson Bros.,* for instance, the restriction at issue was relatively recent, and the relevant parties were still alive. Thus, live testimony regarding intent, purpose, and negotiations were all available to the court. Here, the restrictions at issue are a century old in most cases; any parties involved in or relevant to their creation are no longer available to offer testimony. Instead, the only testimony that could be presented to this court would revolve around the issue of "changed circumstances" or the present character of the neighborhood. But on this point as well, no testimony that could be presented at trial would impact upon the resolution of this case. As mentioned earlier, the parties do not even disagree on the make-up of the neighborhood as it exists today; they simply focus on different aspects. For instance, it is beyond reasonable dispute that, with the exception of the Bloomfield Avenue lots, the remainder of the lots in the 1890 Plat (particularly those lots in the "U" around Everett Field) remain residential. It is likewise beyond any reasonable dispute that the Condit Lots along Bloomfield Avenue have largely been developed commercially and are presently zoned exclusively for commercial use. It is only the legal impact of such facts that this court is left to decide upon. Thus, the court finds that application of the *Davidson Bros.* reasonability

analysis is appropriate under the circumstances presented by this case.

■ In assessing the reasonability of a restrictive covenant, the first factor courts consider is "[t]he intention of the parties when the covenant was executed, and whether the parties had a viable purpose which did not at the time interfere with existing commercial laws, such as antitrust laws, or public policy." Any attempted analysis of this factor must begin with a recognition that the subject covenant was agreed to well over a century ago. A determination regarding "intent" will thus be limited because all of the parties present at the covenant's inception have long since passed away, leaving us with only the language recorded in the deed. Accordingly, the 1893 deed out of Condit stated in relevant part:

> this conveyance is made expressly subject to the restrictions that the premises shall not be used for commercial or manufacturing purposes and the parties of the first part [Condit] bind themselves and their heirs and assigns, that a plot of land [referring to the "Lawn" which is now Everett Field] shall be perpetually reserved for common purposes as a park or pleasure ground.

■ As plaintiffs have pointed out, interpreting a covenant requires courts to examine both the language of the restriction and the circumstances surrounding its creation. *Murphy v. Trapani*, 255 *N.J.Super.* 65, 72, 604 *A.*2d 635 (App. Div. 1992).

Plaintiffs have generally taken the position throughout that, based on the relevant deeds, we can infer Condit's intent was to create a neighborhood scheme of restrictions in order to preserve the residential character of the neighborhood surrounding the Lawn, including 200 Bloomfield. Defendant argues to the contrary that it was not truly Condit's intention to perpetually restrict and preserve the properties surrounding Lawn; this, it argues, is because "when a thing is within the exclusive control of a party ... the best evidence of the intentions of that party is what was actually done." In this respect then, defendant points out that Condit failed to convey all of the properties with perpetual restrictions against commercial use.

Under the circumstances presented in this case, a conclusive determination of the original parties' intent is not possible. Immediately, however, the court feels compelled to acknowledge a point that Defendant has not meaningfully commented upon. The covenants that plaintiffs assert contain "perpetual" restrictions on commercial use are actually more equivocal than presented. When discussing the restrictions upon the grantee, the 1893 deed out of Condit states only that "the premises shall not be used for commercial or manufacturing purposes." The word "perpetual" does not appear in relation to the restriction against commercial use and, in fact, there is no discussion of the restriction's effective period at all. The covenant upon the Grantor (Condit), however, states that the Lawn "shall be perpetually reserved for common purposes as a park or pleasure ground." The only explicitly "perpetual" restriction then was on Condit himself. Thus, while it is fairly apparent that the restriction on commercial use was intended to relate to the Lawn's permanent preservation as a park, it is not as clear that the Grantor and Grantee intended for the restriction on commercial use to also remain effective in perpetuity. It is certainly not unreasonable to conclude that Condit intended the restriction against commercial use to mirror the restriction against himself, but such a conclusion would nonetheless be an assumption on the part of the court. Moreover, the fact that each of the properties around the park were not identically restricted also calls into question the true intent of the parties in this regard. Thus, while it was certainly the intent of the parties that commercial use of 200 Bloomfield be restricted, the intent of the parties as to the duration of such a restriction is less conclusive.

The second *Davidson Bros.* factor asks "[w]hether the covenant had an impact on the consideration exchanged when the covenant was originally executed. This may provide a measure of the value to the parties of the covenant at the time." On this factor, the court simply has no ability to determine the extent to

which the covenants on 200 Bloomfield affected the consideration paid or received by either party to the original covenant.

The third *Davidson Bros.* factor considers whether "the covenant clearly and expressly sets forth the restrictions." As noted above, the restriction clearly limits the use of the property, though no duration is expressly stated. On this factor defendant only argues, as it did with respect to notice earlier, that the generic reference to "restrictions of record" in later deeds was insufficient to alert defendant to the prohibitions on record. Defendant's argument in this regard misses the mark. The relevant restriction is contained in the 1893 deed; the language in that deed unambiguously restricts commercial use of the property. That later deeds in the chain of title are less specific about the restriction is irrelevant to this particular inquiry.

Defendant's notice argument, however, bears a greater relation to the Fourth *Davidson Bros.* factor. The fourth *Davidson Bros.* factor asks, "[w]hether the covenant was in writing, recorded, and if so, whether the subsequent grantee had actual notice of the covenant." Here, it is beyond dispute that the covenant was both in writing and properly recorded. As discussed above, defendant thus had record (constructive) notice of the restrictions based solely on the fact that they are recorded in the chain of title. Actual notice of the restrictions, however, as referenced in the fourth *Davidson Bros.* factor is a slightly different matter.

A subsequent grantee is said to have actual notice when they possess "actual knowledge or information that a claim is outstanding against the property he or she proposes to acquire." *See* 14–82 *Powell on Real Property* § 82.02 (2015) (Michael Allan Wolf ed., Lexis Nexis Matthew Bender); *see also Steiger v. Lenoci,* 323 *N.J.Super.* 529, 537, 733 *A.*2d 1192 (App. Div. 1999) (distinguishing constructive notice based solely on restriction's presence in a deed with actual notice based on party's literal awareness of the restriction). While constructive notice is sufficient notice to a bona fide purchaser such that a covenant will "run with the land," the

reasonableness analysis used to determine whether a restriction should be enforced, leaves room to consider whether a party had actual notice of a restriction. In the present case, defendant has certified, and plaintiffs have not contended otherwise, that it paid full value for this property, conducted a title search that did not reveal any restrictions, and otherwise had no awareness of the restriction until being advised by one of the plaintiffs. It is also notable that defendant purchased the property after the lot was rezoned for commercial use as part of the Extended Town Center. Though not dispositive, the fact that defendant took title to 200 Bloomfield without actual knowledge of the restriction on commercial use, which had not been stated with specificity since the 1923 deed, is a fact the court must consider in its "reasonableness" analysis.

The fifth *Davidson Bros.* factor considers whether "the covenant is reasonable concerning area, time or duration," noting that "[c]ovenants that extend for perpetuity or beyond the terms of a lease may often be unreasonable." On this point, plaintiffs argue that the "perpetual" scope of the restriction is reasonable because Condit was similarly restricting the use of the Lawn into perpetuity. Defendant argues that the covenant is unreasonable because it had not been stated specifically in the chain of title for well over sixty years and because the neighborhood/zoning of the property has changed. Defendant's argument on this point misses the mark as well; this factor is concerned with the restriction's geographic and temporal scope, not its discoverability in a title chain or whether it conflicts with zoning requirements.

While the Court in *Davidson Bros.* stated that covenants that remain effective into perpetuity may often be deemed unreasonable, the reasonability of this particular covenant is a closer call for the very reason articulated by plaintiffs. Accepting for purposes of analyzing this factor that that the restriction *is* perpetual, it would be sensible—and therefore not unreasonable—that if the restriction against non-park use of the Lawn was perpetually effective that the corresponding covenant against commercial de-

velopment would likewise be perpetual. On the other hand, this recognition is undermined by the reality that so many of the other properties abutting the park were either left unrestricted entirely or were restricted for finite periods. Coupled with the present make-up of Bloomfield Avenue, discussed in *Davidson Bros.* factors 7 and 8, it may be that a perpetual restriction against commercial use limited to 200 Bloomfield is no longer reasonable because its ability to preserve the character of the park is substantially weakened by the lack of reciprocal restrictions.

The sixth *Davidson Bros.* factor, which considers whether a covenant imposes an unreasonable restraint on trade or secures a monopoly for the covenanter, is not relevant to the present analysis.

The seventh *Davidson Bros.* factor requires courts to consider whether a covenant interferes with the public interest. The eighth *Davidson Bros.* factor asks whether changed circumstances make the covenant unreasonable, even if it was reasonable at the time it was originally executed. Taken together, these final two considerations present the most support for defendant's position. Beginning with "changed circumstances," both parties have almost exclusively limited their discussion of "changed circumstances" to the neighborhood scheme context. As amply demonstrated by the myriad case law plaintiffs cite, invalidating a restriction that is part of a neighborhood scheme based on an argument of changed circumstances places an extremely heavy burden on the party seeking non-enforcement to show there has been a pervasive transformation of the entire neighborhood that would indicate the plan had been wholly abandoned. *See e.g.*, *Steiger, supra,* 323 *N.J.Super.* at 535, 733 *A.*2d 1192; *Homann, supra,* 296 *N.J.Super.* at 336, 686 *A.*2d 1226. Considering this heavy burden, if the court were of a mind that there was a valid neighborhood scheme, defendant's changed circumstances argument would fail. In the present context, however, where the court is simply considering the reasonableness of the restriction on its own—not as part of a neighborhood scheme—the changed circum-

stance analysis need not cast such a wide net. Pursuant to the directive in *Davidson Bros.*, the relevant inquiry is simply whether changed circumstances make the covenant unreasonable, even if it was reasonable at the time it was originally executed.

Here, there are two key "changed circumstances" that lead this court to believe that the restrictive covenant can no longer be enforced reasonably. First, it is beyond any serious debate that the portion of the 1890 Plat that is on Bloomfield Avenue no longer possesses the residential character it presumably had in 1893. Defendant has offered an expert's report on this point, but it is not even necessary to resort to an expert's findings.[7] The images supplied by defendant in their brief alone demonstrate this fact. It is not disputed that commercial development is the standard for the properties along Bloomfield Avenue as a whole. Notably, this is even true of the other Condit Lots with frontage on Bloomfield Avenue, which are largely developed commercially.

With their focus on the purported neighborhood scheme surrounding the Lawn, plaintiffs have largely dismissed the commercial development of Bloomfield Avenue as irrelevant. The only substantive comment on this point they offer is that "the opposite side of Bloomfield Avenue has long been predominantly commercial, as evidenced by the Annin Flag Factory built in 1917" (emphasis in original). Plaintiffs then point out that "even the factory's construction in 1917 did not stop the prior owners of 200 Bloomfield Avenue from inserting their own restriction(s) against commercial use in both 1920 and 1923." This argument is unavailing. The existence of a single factory, constructed nearly a quarter century after the original restrictive covenant, does not in any way support a conclusion that the character of development along Bloomfield Avenue has been primarily commercial since the re-

---

[7] This expert's report (defendant's second expert report, not to be confused with the "Rizzo Report" referenced earlier) was drafted by Philips Preiss Gryciel LLC, a planning and real estate consultant firm, deals mostly with the pattern of development along Bloomfield Avenue at large as well as those Bloomfield Avenue properties that were Condit lots specifically.

strictive covenant was placed in the deed to 200 Bloomfield. This holds true even if the court were to view the restated/slightly modified restrictions in subsequent deeds referenced by plaintiffs as fully independent and distinct restrictions. Those subsequent deeds were, at longest, issued only six years after the construction of the factory. There is no reason to believe that the transformation to commercial development along Bloomfield Avenue would have been fully realized in the span of six years.

That there have been "changed circumstances" in the area along Bloomfield Avenue is even further supported by a second consideration, which is inextricably related to the first: 200 Bloomfield is located in an area presently zoned exclusively for commercial use, which prohibits free-standing single family residential development. If there were any doubt that the residential character of Bloomfield Avenue surrounding the subject property had changed, the fact that it was subsequently rezoned exclusively for commercial development dispels any such notion. In conducting a reasonableness evaluation, the court simply cannot ignore the reality that the restrictions on 200 Bloomfield put it at odds with the present zoning laws.

While the conflict between the restriction and the zoning does not, on its own, render the covenant ineffective as a matter of law it nonetheless factors significantly into an analysis of reasonability. This is especially so in light of the seventh *Davidson Bros.* factor, which considers whether a covenant interferes with the public interest. The rezoning of the area along Bloomfield Avenue is certainly an indication that the Township of Verona, on behalf of its residents, has an interest in developing its "Extended Town Center Zone" in the manner reflected by the zoning regulations it has enacted. The township determined that achieving the desired make-up of the area also meant prohibiting single-family residential development. This public purpose is at odds with a restrictive covenant that strictly limits use to a purpose expressly prohibited by zoning. The conflict here is clear; a restrictive covenant prohibiting commercial development on a property located in a

zoning district where commercial development is the only permissible use is contrary to the public interest reflected in the municipal zoning ordinance.

In addition to the specific *Davidson Bros.* factors, other considerations offer even further support for the conclusion that enforcement of the covenant would be unreasonable. As presently constituted, 200 Bloomfield is distinct from most other lots in the Condit map that are similarly restricted, such as those along Westview Road. This is because it is located on Bloomfield Avenue—a major commercial thoroughfare, zoned exclusively for commercial use. If this court were forced to consider the reasonableness of a similar restriction on one of the Westview properties, the conclusion may very well have been different since Westview Road is still entirely residential in character and is zoned accordingly. Along these lines, the court reiterates that the one similarly situated property, Condit Lot 34, bordering both Bloomfield Avenues and Everett Field, was never subject to a restriction on commercial use, and is presently developed (at least in part) commercially. This reality has not impacted upon the preservation of Everett Field. There is no reason to think that the same will not hold true for the development of 200 Bloomfield—especially in light of the fact that the deed conveying Everett Field to Verona already requires that it "shall be perpetually kept and maintained for park purposes" irrespective of the surrounding lots. Non-enforcement of the restriction as it relates to 200 Bloomfield is simply not a threat to Everett Field's continued use as a public park.

In sum, the court finds that an evaluation of reasonableness based on the factors supplied by the Supreme Court in *Davidson Bros.*, as well as other considerations, leads to the conclusion that the restrictive covenant against commercial use recorded in the chain of title to 200 Bloomfield should not be enforced.

CONCLUSION:

For the reasons stated above, plaintiffs' motion for summary judgment seeking to enforce the restriction against commercial use contained in the chain of title to 200 Bloomfield Avenues is

denied. Defendant's cross-motion for summary judgment dismissing the complaint and ordering that the restrictive covenant against commercial development may not be enforced and that defendant holds good and valid title to 200 Bloomfield free and clear of any claim by plaintiffs is granted.